# IN THE UNITED STATES DISTRICT COURT
## FOR THE NORTHERN DISTRICT OF ILLINOIS
### EASTERN DIVISION

| | | |
|---|---|---|
| NATIONAL FINANCIAL PARTNERS CORP., a Delaware corporation | ) ) ) | |
| Plaintiff, | ) ) | |
| vs. | ) ) | Civil Action No. 14-cv-7424 |
| PAYCOM SOFTWARE, INC. a Delaware corporation, and | ) ) ) | Honorable Judge Matthew F. Kennelly Magistrate Judge Sidney I. Schenkier |
| PAYCOM PAYROLL, LLC, a Delaware limited liability company, | ) ) ) | |
| Defendants. | ) | |

**DEFENDANTS' MEMORANDUM IN OPPOSITION TO PLAINITFF'S MOTION FOR PRELIMINARY INJUNCTION**

# Table of Contents

INTRODUCTION ................................................................................................ 1

FACTUAL BACKGROUND ............................................................................. 2

    A.  NFP's Business ........................................................................... 2

    B.  Paycom's Business ..................................................................... 3

    C.  Paycom's New Logo .................................................................. 4

    D.  Litigation History ...................................................................... 5

    E.  The Survey Evidence from the Expert Reports ......................... 6

       1.  Survey of NFP's Expert, Dr. Michael Rappeport ............... 6

       2.  Paycom's Expert, James T. Berger ..................................... 7

ARGUMENT ..................................................................................................... 9

I.    NFP CANNOT DEMONSTRATE IRREPARABLE HARM ...................... 9

    A.  NFP Has Not And Cannot Establish The Likelihood of Irreparable Harm ................. 10

    B.  NFP's Delay to Act Belies Its Irreparable Harm Claim ................. 11

II.    NFP CANNOT DEMONSTRATE THAT IT IS LIKELY TO SUCCEED ON THE MERITS ..................................................................... 12

    A.  NFP Does Not Have a Valid, Protectable Trademark To Enforce Against Paycom ..... 12

    B.  NFP Cannot Demonstrate a Likelihood of Confusion ................. 15

       1.  NFP's Marks Are Weak ...................................................... 15

       2.  The Marks Are Not Similar In Appearance And Suggestion ..................................... 16

       3.  The Services Offered by Paycom and NFP Are At Most Adjacent .......................... 18

       4.  Consumers Use Care When Selecting Human Resources Services, Including Payroll Processing Services ............................ 19

       5.  There Is No Actual Confusion .............................................. 22

       6.  Paycom Had No Bad Intent When Selecting Its Mark ............... 26

       7.  The Parties Offer Their Services in Different Marketing Channels ............. 26

    C.  Abandonment Due to Naked Licensing ................................... 27

III.    THE BALANCING OF THE HARDSHIPS FAVORS PAYCOM ............ 28

IV.    THE PUBLIC INTEREST WEIGHS IN FAVOR OF PAYCOM ............ 30

V.    IF A PRELIMINARY INJUNCTION IS ENTERED, THE REQUIRED BOND AMOUNT SHOULD BE SIGNIFICANT ................... 30

## TABLE OF AUTHORITIES

*Abraham v. Alpha Chi Omega*,
  708 F.3d 614 (5th Cir. 2013), cert. denied, 134 S. Ct. 88, 187 L. Ed. 2d 254 (2013)............... 10

*AM Gen. Corp. v. Daimlerchrysler Corp.*,
  311 F.3d 796 (7th Cir. 2002)........................................................................................ 21

*Audi AG v. D'Amato*,
  469 F.3d 534 (6th Cir. 2006)........................................................................................ 10

*Autozone, Inc. v. Strick*,
  543 F.3d 923 (7th Cir. 2008)................................................................................. 16, 18

*Bracco Diagnostics, Inc. v. Amersham Health, Inc.*,
  627 F. Supp. 2d 384 (D. N.J. 2009) ............................................................................. 8

*CAE, Inc. v. Clean Air Eng'g., Inc.*,
  267 F.3d 660 (7th Cir. 2001)........................................................................................ 19

*Cellular Sales, Inc. v. Mackay*,
  942 F.2d 483 (8th Cir. 1991)........................................................................................ 10

*Champions Golf Club v. Champions Golf Club*,
  78 F.3d 1111 (6th Cir. 1996)................................................................................. 21, 22

*Computer Care v. Serv. Sys. Enters., Inc.*,
  982 F.2d 1063 (7th Cir. 1992)...................................................................................... 22

*Cumberland Packing Corp. v. Monsanto Co.*,
  32 F. Supp. 2d 561(E.D.N.Y. 1999)............................................................................. 7

*Custom Vehicles Inc. v. Forest River, Inc.*,
  476 F.3d 481 (7th Cir. 2007)........................................................................................ 13

*Door Sys., Inc. v. Pro--Line Door Sys., Inc.*,
  83 F.3d 169 (7th Cir. 1996).......................................................................................... 22

*eBay, Inc. v. Merchexchange, LLC*,
  547 U.S. 388 (2006)....................................................................................................... 9

*EnVerve Inc., v. Unger Meat Co.*,
    779 F. Supp. 2d 840 (N.D. Ill. 2011) ........................................................... 27, 28, 30

*Eva's Bridal, Ltd. v. Halanick Enters.*,
    639 F.3d 788 (7th Cir. 2011)..................................................................................... 27

*Ferring Pharm., Inc. v. Watson Pharm., Inc.*,
    765 F.3d 205 (3rd Cir. 2014)..................................................................................... 10

*Flava Works, Inc. v. Gunter*,
    689 F.3d 754 (7th Cir. 2012)....................................................................................... 9

*Forum Corp. of N. Am. v. Forum, Ltd.*,
    903 F.2d 434 (7th Cir. 1990)............................................................................... 19, 26

*Herb Reed Enterprises, LLC v. Florida Entertainment Mgt., Inc.*,
    736 F.3d 1239 (9th Cir. 2013)................................................................................... 10

*Hydrox Chem. Co. v. Diversey, Inc.*,
    2015 U.S. Dist. LEXIS 36276 (N.D. Ill. March 23, 2015) ...................................... 22

*Kraft Foods Group Brands LLC v. Cracker Barrel Old Country Store, Inc.*,
    735 F.3d 735 (7th Cir. 2013)....................................................................................... 9

*MB Fin. Bank, N.A. v. MB Real Estate Servs.*,
    2003 U.S. Dist. LEXIS 21051 (N.D. Ill. Nov. 20, 2003)........................... 12, 20, 21, 22, 23, 24

*McGraw-Edison Co. v. Walt Disney Productions*,
    787 F.2d 1163 (7th Cir. 1986)................................................................................... 17

*Meridian Mut. Ins. Co. v. Meridian Ins. Group*,
    128 F.3d 1111 (7th Cir. 1997)............................................................................... 17, 26

*Michigan v. U.S. Corps of Army Engineers*,
    667 F.3d 765 (7th Cir. 2011)..................................................................................... 28

*Nat. Conf. of Bar Examiners v. Multistate Legal Studies, Inc.*,
    692 F.2d 478 (7th Cir. 1982)..................................................................................... 28

*Nat'l Distillers Prods. Co., LLC v. Refreshment Brands, Inc.*,
  198 F. Supp. 2d 474 (S.D.N.Y. 2002) ...................................................................... 7

*Packman v. Chicago Tribune Co.*,
  267 F.3d 628 (7th Cir. 2001) ...................................................................... 15, 22

*Planet Hollywood (Region IV), Inc. v. Hollywood Casino Corp.*,
  80 F. Supp. 2d 815 (N.D. Ill. 1999) ...................................................................... 13

*Platinum Home Mortgage Corp. v. Platinum Fin. Group, Inc.*,
  149 F.3d 722 (7th Cir. 1998) ...................................................................... 18

*Promatek Industries, Ltd. v. Equitrac Corp.*,
  300 F.3d 808 (7th Cir. 2002) ...................................................................... 9

*Real-Time Reporters. P.C. v. Sonntag Reporting Servs.*,
  2013 U.S. Dist. LEXIS 155090 (N.D. Ill. Oct. 29, 2013) ............................................. 9, 11, 12

*S. Indus. v. Diamond Multimedia Sys.*,
  991 F. Supp. 1012 (N.D. Ill. 1998) ...................................................................... 12, 13, 14

*Sands, Taylor & Wood Co. v. Quaker Oats Co.*,
  978 F.2d 947 (7th Cir. 1992) ...................................................................... 15

*Smith Fiberglass Prods., Inc. v. Ameron, Inc.*,
  7 F.3d 1327 (7th Cir. 1993) ...................................................................... 22, 24, 25

*Stokely-Van Camp Inc. v. Coca-Cola Co.*,
  1987 U.S. Dist. LEXIS 781 (N.D. Ill. Jan. 29, 1987) ............................................. 12

*Storck USA L.P. v. Farley Candy Co.*,
  14 F.3d 311 (7th Cir. 1994) ...................................................................... 28

*Sullivan v. CBS Corp.*,
  385 F.3d 772 (7th Cir. 2004) ...................................................................... 15

*Sunmark, Inc. v. Ocean Spray Cranberries*,
  64 F.3d 1055 (7th Cir. 1995) ...................................................................... 22

*TMT N. Am. Inc. v. Magic Touch GmbH*,
  124 F.3d 876 (7th Cir. 1997) ...................................................................... 27

*Ty, Inc. v. Jones Grp., Inc.*,
   237 F.3d 891 (7th Cir. 2001)........................................................................................... 12, 16, 28

*Vienna Beef, Ltd. v. Red Hot Chi., Inc.*,
   833 F. Supp. 2d (N.D. Ill. 2011) ........................................................................................ 28, 30

*Wells Fargo and Co. v. ABD Ins. and Fin. Services, Inc.*,
   2014 U.S. Dist. LEXIS 121444 (N.D.Cal. Aug. 28, 2014)........................................................ 11

*Winter v. Natural Res. Defense Council, Inc.*,
   555 U.S. 7 (2008) ............................................................................................................... 9

*Wm. Wrigley Jr. Co. v. Swerve IP, LLC*,
   900 F. Supp. 2d 794 (N.D. Ill. 2012) ................................................................................... 10

*Ziebart International Corp. v. After Market Associates, Inc.*,
   802 F.2d 220 (7th Cir. 1986)............................................................................................ 16, 17

## **INTRODUCTION**

Having waited four months after discovering Paycom's new logo before moving for preliminary injunction, NFP admits it has lost no sales from and conducted no remedial efforts to correct the alleged irreparable harm. NFP's delay, its failure to produce any evidence of actual or imminent harm, and its acquiescence in Paycom's use of its logo, preclude NFP from satisfying its burden on irreparable harm, which alone is enough to defeat NFP's motion.

NFP also fails to prove a likelihood of success on the merits. First and foremost, NFP has proven no actual confusion. From that inauspicious beginning, each and every factor in the Seventh Circuit's likelihood of confusion test either weighs in Paycom's favor or is neutral at most. NFP's attempt to argue otherwise requires sophistry in order to turn NFP's logo and business into something they simply are not. Independently, NFP's complete failure to prove a likelihood of success defeats its request for injunctive relief.

NFP also cannot establish that the balance of hardships tips in its favor. Paycom's new logo incorporates Paycom's name as well as its long-utilized, two color green marketing scheme that established Paycom's brand recognition among payroll and HR professionals. Paycom has invested over ▮▮▮▮▮▮ developing and promoting "Paycom Green" for well more than a decade. In the past 14 months alone, Paycom has spent over ▮▮▮▮▮ promoting its new logo, including the installation of that logo over its Oklahoma City HQ and at each of its thirty-five (35) regional offices. Paycom has also utilized its new logo on physical marketing materials, its website, web advertising, and within its Software-as-a-Service ("SaaS") product. These efforts have established significant goodwill and brand recognition.

▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮

▮▮▮▮ Moreover, balancing the ▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮ versus

1

NFP's truly uninspired effort to protect its allegedly "extremely valuable" logo unambiguously favors Paycom. With this backdrop, the public interest even leans towards denying NFP's request to enjoin Paycom until trial in February 2016. As such, NFP's Motion must be denied.

## FACTUAL BACKGROUND

### A.   NFP's Business

NFP offers a variety of brokerage and consulting services primarily in the areas of insurance, investments, and employee health and retirement benefits.[1]  NFP's Senior Vice President and President of its Corporate Client Group, Mr. Edward O'Malley, confirmed that NFP offers those services and associated products.[2] Mr. O'Malley also declared and testified along with Mr. Eric Boester (NFP's Senior Vice President of Business Development and corporate designee) that NFP provides some payroll offering, but neither individual could (or would) supply any details about that alleged offering.[3] ██████████████████████████████

████████████████████████████████████████████████████████████████

████████████████████████████████████████████████████████████████

██████████████████████[4] Both Messrs. Boester and O'Malley readily agreed that NFP regularly recommends third party payroll companies to its clients.[5]

Ancillary to most of NFP's services is the unavoidable need to collect employee data. If NFP's clients' employees purchase health, life, and/or disability insurance NFP only will collect their personal data for submission to the insurance plan provider. Likewise, with NFP's clients' employees' retirement plans. ████████████████████████████████

████████████████████████████████████████████████████████████████

---

[1] NFP Memorandum of Law in Support of its Motion for Preliminary Injunction, Dkt. No. 14 ( "NFP Brief") at Exh. 1.
[2] NFP Brief at Ex 2, ¶¶ 3-4; Declaration of Jordan A. Sigale ("Sigale Decl."), Exh. 1 at 25:9-35:4.
[3] NFP Brief at Ex 2, ¶ 6; Sigale Decl., Exh. 1 at 170:17-176:10, Exh. 2 at 138:24-144:10.
[4] Sigale Decl., Exh. 2 at 166:5-167:1.
[5] Sigale Decl., Exh. 1 at 176:11-180:6, Exh. 2 at 142:12-144:10.

███.[6]  However, NFP does not market itself as a collector of data.  Indeed, NFP primarily uses

a third party, bSwift, and its proprietary software to collect and house that data.[7]

**B.**     **Paycom's Business**

Paycom offers payroll administration and data management services. Its payroll

administration service permits clients to transfer responsibility for making payroll and ensure

that the proper tax withholding and other payroll deductions are remitted to the proper payees.[8]

Paycom's data management service provides the means for its clients to collect, organize, store,

and manage the myriad of data relative to their employees.[9] Paycom licenses its proprietary

software and database to over ██████.[10] Paycom's software enables each client access (via

the Internet) to a dedicated database where employee information is entered once and made

available throughout the various functions that may be desired by clients and their employees.[11]

Once the employee data is entered, it can be used to auto-fill W-4s and I-9s, create and submit

timesheets, make time-off requests, submit expenses, populate payroll with employee time data,

tax withholding, benefit deductions, and create benefits reports that clients submit to their

employee benefits advisors, including NFP.[12]

In general, Paycom offers five distinct types of information management (database)

services: (a) Payroll Administration; (b) Talent Acquisition;  (c) Talent Management; (d) HR

Management; and (e) Time and Labor Management.[13] Paycom's main business is in payroll

administration, where it acts on behalf of its client to pay the employees' wages and submit taxes

---

[6] Sigale Decl., Exh.1 at 28:7-33:9.
[7] Sigale Decl., Exh 1 at 36:10-37:6, Exh. 2 at 176:17-177:19.
[8] Declaration of Zachary Miller ("Miller Decl."),¶¶ 17, 21.
[9] Declaration of Amy Newman-Wells ("Newman-Wells Decl."), ¶47-48; Exh. 3; Exh. 4.
[10] Newman-Wells Decl., ¶ 4
[11] Newman-Wells Decl.,¶¶ 47-48; ; Exh. 3; Exh. 4.
[12] Newman-Wells Decl.,¶¶ 47-53; Exh. 3; Exh. 5.
[13] Miller Decl., ¶¶ 16-49; Exhs. 6-15.

to tax agencies.[14] Unlike NFP, Paycom does not act as a broker for any insurance or retirement products or services. Unlike NFP, Paycom does not provide consulting services. Data collection and organization is not merely an ancillary aspect of Paycom's business, it is Paycom's business.

### C.      Paycom's New Logo

Around December 2012, Paycom decided to update its logo.[15] The only pre-condition was that the new logo must use "Paycom Green" (i.e. Pantone Matching System 348)[16] – a color used by Paycom in its prior logos since 2002.[17] Paycom researched competitor logos to ensure their new logo would be unique.[18] Paycom considered and rejected many potential logos.[19] Finally, at the end of January, Amy Newman-Wells, Paycom's Director of Marketing, was inspired by a logo depicted in the movie "Jack Ryan Shadow Recruit".[20] While at the movie and noting two interlocking shapes of a fictitious three-dimensional cube logo, Ms. Newman-Wells grabbed her checkbook and sketched an interlocking "P" and "C".[21] This sketch in combination with the word "paycom"[22] was ultimately formally approved as Paycom's new logo on February 24, 2014.[23] Paycom believes the "P" and "C" can represent "Payroll" and "Company", or "Pay" and "com", or "Paycom" and its "customers."[24]

Starting February 28, 2014 through the end of March 2014, the new logo was disseminated to the public on Paycom's website, in Paycom's proprietary software, in white papers, in promotional videos posted on social media (e.g. Facebook, YouTube, Google+), in

---

[14] Miller Decl., ¶¶ 17, 21
[15] Newman-Wells Decl., ¶ 12.
[16] Many companies use the Pantone Color Guide.  Newman-Wells Decl., ¶ 7.
[17] Newman-Wells Decl., ¶¶ 8-11; Exh. 3; Exh. 16.
[18] Newman-Wells Decl., ¶ 13.
[19] Newman-Wells Decl., ¶ 14.
[20] Newman-Wells Decl., ¶ 15.
[21] Newman-Wells Decl., ¶ 16.
[22] Newman-Wells Decl., ¶¶ 16-21.
[23] Newman-Wells Decl., ¶ 21.
[24] Newman-Wells Decl., ¶ 20.

REDACTED - PUBLIC VERSION

Paycom's announcement of its future NYSE listing, mass-mailings, on business cards, as well as many other marketing and business channels.[25] Since the March 2014 rollout, the Paycom logo has been used consistently in marketing and promotion including external and internal signage at Paycom's corporate headquarters and 35 regional offices, a new trade show booth, and outdoor advertising.[26] The out-of-pocket cost of these efforts from February 2014 to the present has been well in excess of ██████████████████████████████.[27]

### D. Litigation History

On September 23, 2014, NFP's Executive Vice President and General Counsel, Timothy Robb, sent an email to Lauren Toppins, Paycom's Corporate Attorney.[28] The e-mail indicated only that he had an "urgent legal matter" to discuss with Ms. Toppins. Mr. Robb and Ms. Toppins scheduled a call for mid-afternoon.[29] About an hour prior to that call, Mr. Robb sent Ms. Toppins two documents: "Material Regarding NFP's Trademark Concerns" and "Tolling Agreement".[30] The first outlined NFP's position relating to Paycom's alleged trademark infringement, and the second proposed a two week "resolution" period that preserved NFP's desire that any suit go forward in Chicago.[31] During the call, Mr. Robb indicated that if Paycom did not sign the "Tolling Agreement" by 4:30 CT (less than two hours later), NFP would sue Paycom in Chicago for trademark infringement.[32]

Ultimately, as this Court knows, that day, Paycom and NFP filed suit in the Western District of Oklahoma and this Court, respectively. Then, on October 15, 2014, NFP filed a

---

[25] Newman-Wells Decl., ¶¶ 23-36; Exh. 4; Exh. 17.
[26] Newman-Wells Decl., ¶¶ 37-46; Exh. 18.
[27] Newman-Wells Decl., ¶¶ 23, 28, 32-38, 40-45.
[28] Sigale Decl., Exh. 19.
[29] Sigale Decl., Exh. 19.
[30] Sigale Decl., Exh. 20.
[31] Sigale Decl., Exh. 20.
[32] Sigale Decl., ¶ 7.

Motion for Preliminary Injunction in this Court, and a Motion to Dismiss in the Western District of Oklahoma.[33] Five days later, Paycom filed a Motion to Transfer Venue in this Court.[34] Ultimately, the Oklahoma court dismissed its case, and this Court denied Paycom's venue motion.[35] Since then the parties have been preparing for a preliminary injunction. As part of that process, the parties have exchanged expert reports on the issues of likelihood of confusion.

### E.    The Survey Evidence from the Expert Reports

1.    Survey of NFP's Expert, Dr. Michael Rappeport

Dr. Rappeport conducted a likelihood of confusion survey with 100 respondents over the telephone while respondents accessed a website that provided a so-called "two-room" approach. The respondents were shown the NFP Logo (labeled Logo K) in a first room, asked some questions, after which they were directed to a second room (or webpage) where five logos were displayed in a row.[36] They were asked to think back to the first logo and determine whether one or more of these logos is used by a company that is connected or affiliated with the company that uses the first logo, none of the logos, or "don't you have an opinion."[37] If the respondent thought one or more of the logos was "connected or affiliated" with the first logo, they were asked to identify which logos they thought were affiliated.[38] After subtracting for "noise" (i.e. the results from 80 respondents performing the same two-room test with a hypothetical blue PC logo), Dr. Rappeport reported that 39% of the respondents think the Paycom Logo is used by a company connected or affiliated with a company that uses the NFP Logo. Consequently, he concluded that

---

[33] Dkt. # 13; Dkt. # 5, Case 5:14-cv-01020-R (W.D. Ok.).
[34] Dkt. # 20.
[35] Dkt. # 31, Case 5:14-cv-01020-R (W.D. Ok.); Dkt. # 38.
[36] Sigale Decl., Exh. 21 at p. 7:1-2.
[37] Sigale Decl., Exh. 21 at p. 7:5-9.
[38] Sigale Decl., Exh. 21 at p. 7:13-15.

there is "very strong likelihood of confusion" between the NFP and Paycom Logos.[39] To validate his survey, two members of Dr. Rappeport's own company "read all of the interviews."[40]

  2.  Paycom's Expert, James T. Berger

  Mr. Berger reviewed Dr. Rappeport's report and methodology and reported results of his own survey.[41] Mr. Berger opined that Dr. Rappeport's survey is flawed for several reasons. ***First***, the "two-room" process is biased in favor of NFP because it cues respondents to look for a particular unfamiliar[42] color combination logo.[43] *See Nat'l Distillers Prods. Co., LLC v. Refreshment Brands, Inc.*, 198 F. Supp. 2d 474, 484 (S.D.N.Y. 2002) ("The second major flaw we discern in the Rappeport Survey is that every respondent was exposed to the Teton Glacier product in the first room, thus acquainting them with a product that they would almost certainly have been unfamiliar with otherwise, due to Teton Glacier's very limited distribution network and weak sales"). ***Second***, the array of logos in Dr. Rappeport's study impermissibly lead respondents to pick the Paycom Logo, as no other logo in the array resembled the interlocking aspect and green color common to the NFP and Paycom logos.[44] *See Cumberland Packing Corp. v. Monsanto Co.*, 32 F. Supp. 2d 561, 576 (E.D.N.Y. 1999) (finding unpersuasive Dr. Rappeport's two-room survey in part because the four "control" items in the second room were not properly selected). Moreover, the odd "don't you have an opinion" answer option in Dr. Rappeport's study practically removed the "don't know" option, forcing respondent to another answer. ***Third***, a survey of this kind usually requires a minimum of 200 respondents in ***both*** the

---

[39] Sigale Decl., Exh. 21 at p. 10:23-24.
[40] Sigale Decl., Exh. 21 at p. 8:14-15.
[41] Sigale Decl., Exh. 22 at pp. 2 and 11-17.
[42] Only 11 of the 180 respondents aggregated from Dr. Rappeport's two studies believed they had ever seen the NFP logo before. None of those 11 were able to correctly identify the logo as belonging to NFP. Sigale Decl., Exh. 43.
[43] Sigale Decl., Exh. 22 at pp. 7:17-8:8.
[44] Sigale Decl., Exh. 22 at p. 8:9-25.

"control" and "test" cells. Dr. Rappeport surveyed 100 in the "test" cell and 80 in the "control" cell.[45] *See Bracco Diagnostics, Inc. v. Amersham Health, Inc.*, 627 F. Supp. 2d 384, 448 (D. N.J. 2009) (excluding testimony and underlying survey of Dr. Rappeport in part because number of participants (110 total) did not meet his own reliability standards). ***Fourth***, the results of Dr. Rappeport's survey should have been validated by an independent, third-party.[46]

Mr. Berger conducted an Internet-based likelihood of confusion survey with more than 200 respondents utilizing a one-step approach comprising an array of six logos that all had "interlocking bars," including the NFP Logo and the Paycom Logo.[47] The respondents were asked four questions about the logos in the array: which logo or logos, if any, do you believe belong to (1) the same company; (2) companies or organizations associated with one another; (3) companies or organization affiliated with one another; and (4) companies or organizations that are sponsored by one another.[48] The number of respondents answering <u>at least both</u> the NFP and Paycom Logos in response to the above questions are: (1) 10 respondents (5% of the survey); (2) 14 respondents (7% of the survey); (3) 12 respondents (6% of the survey); and (4) 4 respondents (2% of the survey).[49] Validation of Mr. Berger's survey was conducted by an independent third-party organization.[50] Based on these results, Mr. Berger concluded that there was no likelihood of confusion between the logos.[51] Mr. Berger also issued a Supplemental Report addressing issues raised by NFP at his deposition, reaffirming there is no likelihood of confusion.[52]

---

[45] Sigale Decl., Exh. 22 at p. 1-5.
[46] Sigale Decl., Exh. 22 at p. 9:13-20.
[47] Sigale Decl., Exh. 22 at p. 11:15-23.
[48] Sigale Decl., Exh. 22 at p. 12:8-22.
[49] Sigale Decl., Exh. 22 at p. 14:3-14.
[50] Sigale Decl., Exh. 22 at p. 17:8-21.
[51] Sigale Decl., Exh. 22 at p. 18:12-17.
[52] Sigale Decl., Exh. 40.

## ARGUMENT

"A preliminary injunction is an extraordinary remedy never awarded as of right," but only "upon a clear showing that the plaintiff is entitled to such relief." *Winter v. Natural Res. Defense Council, Inc.*, 555 U.S. 7, 22, 24 (2008). "A plaintiff seeking a preliminary injunction must establish that he is likely to succeed on the merits, that he is likely to suffer irreparable harm in the absence of preliminary relief, that the balance of equities tips in his favor, and that an injunction is in the public interest." *Id.* NFP's motion for a preliminary injunction must be denied as it fails to "demonstrate a likelihood of success on the merits, that it has no adequate remedy at law, and that it will suffer irreparable harm if the relief is not granted." *Promatek Industries, Ltd. v. Equitrac Corp.*, 300 F.3d 808, 811 (7th Cir. 2002).

## I. NFP CANNOT DEMONSTRATE IRREPARABLE HARM

"For the grant of a preliminary injunction to be proper, the harm to the plaintiff also must be judged irreparable—meaning not fully compensable or avoidable by the issuance of a final judgment . . . in the plaintiff's favor." *Kraft Foods Group Brands LLC v. Cracker Barrel Old Country Store, Inc.*, 735 F.3d 735, 740 (7th Cir. 2013). To prove the existence of this harm NFP relies on a long-standing presumption of irreparable harm.

The presumption of irreparable harm relied upon by NFP is no longer tenable. In *eBay, Inc. v. Merchexchange*, LLC, 547 U.S. 388 (2006), the Supreme Court rejected the long-standing notion that irreparable harm could be presumed, holding that a patentee must present actual evidence to establish irreparable harm. Citing *eBay,* the Seventh Circuit has extended its holding to copyright preliminary injunction motions. *Flava Works, Inc. v. Gunter*, 689 F.3d 754, 755 (7th Cir. 2012) (vacating copyright preliminary injunction based on presumption of irreparable harm). The extension of *eBay* to trademark cases in this circuit, however, remains unresolved. *See e.g., Real-Time Reporters. P.C. v. Sonntag Reporting Servs.*, 2013 U.S. Dist. LEXIS 155090, at *4-5

(N.D. Ill. Oct. 29, 2013)[53] (declining to address whether *eBay* applies because the plaintiff failed to show a likelihood of success); *Wm. Wrigley Jr. Co. v. Swerve IP, LLC*, 900 F. Supp. 2d 794, 798 (N.D. Ill. 2012) (recognizing that *eBay* may apply to trademark cases). A majority of other Circuits that considered the issue have already made that extension. *See, e.g.*, *Herb Reed Enterprises, LLC v. Florida Entertainment Mgt., Inc.*, 736 F.3d 1239, 1242 (9th Cir. 2013); *Ferring Pharm., Inc. v. Watson Pharm., Inc.*, 765 F.3d 205, 206 (3rd Cir. 2014); *Audi AG v. D'Amato*, 469 F.3d 534, 550 (6th Cir. 2006); *but see Abraham v. Alpha Chi Omega,* 708 F.3d 614, 627 (5th Cir. 2013), cert. denied, 134 S. Ct. 88, 187 L. Ed. 2d 254 (2013).

A.    NFP Has Not And Cannot Establish The Likelihood of Irreparable Harm

NFP has not (and cannot) establish a likelihood of irreparable harm. NFP failed to present any evidence that it will actually suffer irreparable harm between now and a February 2016 trial. Instead, NFP said it will be clearly irreparably harmed and stated if an injunction does not issue that "consumers will continue to be confused as to whether Paycom and NFP are the same company or are otherwise somehow affiliated."[54]

NFP will be unable to offer any evidence to establish irreparable harm now or at any point prior to trial. NFP acknowledges it has lost no sales to Paycom.[55] NFP acknowledges it has done nothing to mitigate the alleged harm of its "extremely valuable asset",[56] such as conducting corrective advertising.[57] And NFP has not and cannot provide any evidence of actual harm to its reputation or goodwill flowing from the alleged infringement of its logo.

Evidence similar to the present case has been found sufficient to defeat any finding of irreparable harm. *See e.g.*, *Cellular Sales, Inc. v. Mackay*, 942 F.2d 483, 487 (8th Cir. 1991) (no

---

[53] All unreported decisions are included as Exhibit A.
[54] NFP Brief at 17.
[55] Sigale Decl., Exh. 1 at 192:4-7; Exh. 2 at 215:2-3.
[56] NFP Brief, Ex 2 at ¶ 5.
[57] Sigale Decl., Exh. 2 at 215:11-218:1.

irreparable harm where no evidence of lost sales); *Wells Fargo and Co. v. ABD Ins. and Fin. Services, Inc.*, 2014 U.S. Dist. LEXIS 121444, at *35 (N.D.Cal. Aug. 28, 2014) (no irreparable harm where plaintiff failed to establish harm to its "brand, reputation, and/or goodwill").

The evidence also establishes that NFP, its subsidiaries, and/or affiliates have linked their reputations to Paycom. ████████████████████████████████.[58] ███████████

████████████████████████████████████████████████████████████████████

████████████████████████████████████████████████.[59] NFP's

Benefits Integration Group also recommended Paycom to various NFP clients, ████████

████████████████████████████████.[60] The lack of lost sales and evidence that NFP had already willingly tied its reputation to Paycom, indicate that NFP has not suffered any irreparable harm as a result of Paycom's alleged infringement.

B.     NFP's Delay to Act Belies Its Irreparable Harm Claim

Further weakening any remaining notion that NFP suffered irreparable harm is its undeniable failure to promptly seek relief. ████████████████████████████████████████

████████ ████[61] Yet, NFP waited until September 24, 2014 (over fourteen weeks later) to file suit.[62] NFP then waited three weeks before filing the present motion.[63] NFP's conduct "belies its claims that it is facing irreparable harm that requires immediate injunctive relief." *Real-Time Reporters*, 2013 U.S. Dist. LEXIS 155090, at *3.

In *Real-Time*, the court denied plaintiff's motion for a preliminary injunction, based in part on its finding that plaintiff had (i) delayed in filing suit despite discovering the alleged

---

[58] Sigale Decl., Exhs. 23-25.
[59] Sigale Decl., Exh. 26 at 15:8-12.
[60] Sigale Decl., Exh. 27.
[61] Sigale Decl., Exh. 28.
[62] Dkt. # 1.
[63] Dkt. # 13.

infringement three months earlier, (ii) failed to seek a TRO, and (iii) waited "almost a month" after filing suit to file it motion for preliminary injunction. *Id.*; *see also*, *MB Fin. Bank, N.A. v. MB Real Estate Servs.*, 2003 U.S. Dist. LEXIS 21051, *22-24 (N.D. Ill. Nov. 20, 2003) (delay negates presumption of irreparable harm); *Stokely-Van Camp Inc. v. Coca-Cola Co.*, 1987 U.S. Dist. LEXIS 781, *5-7 (N.D. Ill. Jan. 29, 1987) (finding that a delay of three months while the defendant spent a "substantial amounts" marketing its product indicates a "lack of a need for the extraordinary remedy of a preliminary injunction").

NFP's delay was knowing and intentional and constituted a calculated business decision.



was deemed more important than any irreparable harm NFP claims to have suffered. These acts do not reflect the behavior of a company suffering irreparable harm, and thus, weigh against any such finding requiring "immediate injunctive relief." *Real-Time Reporters,* 2013 U.S. Dist. LEXIS 155090 at *3.

## II. NFP CANNOT DEMONSTRATE THAT IT IS LIKELY TO SUCCEED ON THE MERITS

To demonstrate a likelihood of success on its trademark infringement claim, NFP must establish that it is the owner of valid, protectable mark, and that a likelihood of confusion exists between the two marks. *Ty, Inc. v. Jones Grp., Inc.*, 237 F.3d 891, 896-97 (7th Cir. 2001).

### A. NFP Does Not Have a Valid, Protectable Trademark To Enforce Against Paycom

NFP asserts both registered and common law trademark rights against Paycom. With respect to common law trademarks, the burden is on NFP to establish that it is entitled to protection under the Lanham Act. *S. Indus. v. Diamond Multimedia Sys.*, 991 F. Supp. 1012,

---

[64] Sigale Decl., Exh. 29.

1018 (N.D. Ill. 1998). Part of that burden is establishing that the mark has been used in public

attached to a good or service. *Planet Hollywood (Region IV), Inc. v. Hollywood Casino Corp.*, 80

F. Supp. 2d 815, 879 (N.D. Ill. 1999). The "mere intent to use a mark is insufficient" to establish

trademark protection. *Id*. The amount of activity to constitute use is a factual question, but the

activity should be "sufficiently public to identify or distinguish the marked goods in an

appropriate segment of the public mind as those of the adopter of the mark." *Id*.

Federally registered trademarks enjoy a presumption of validity under the Lanham Act,

which is "easily rebuttable." *Custom Vehicles Inc. v. Forest River, Inc.*, 476 F.3d 481, 485-86

(7th Cir. 2007). However, none of the federal trademark registrations asserted cover Paycom's

business activities at issue in this motion—i.e., "(1) employee benefits administration services,

(2) employee retirement fund administration services, (3) employee health insurance

administration services, and (4) payroll processing, administration and management services".[65]

First, none of NFP's federal trademark registrations are even remotely directed to human

resource management and payroll-related services.[66] NFP admits as much in its Brief.[67] Second,

to the extent NFP's registrations cover International Class 35 they are limited to NFP's

BenefitPartners and PartnerFinancial membership programs (i.e. "Advertising and Marketing

Services in the Field of Insurance").[68] Third, while NFP's recitation of services in International

Class 36\ might appear to encompass the Paycom's non-payroll services, review of the actual

---

[65] See NFP Motion for Preliminary Injunction, Dkt No. 13, ("NFP Motion"), ¶5.
[66] See NFP Brief, Exh. 1.
[67] NFP Brief at p. 9 ("NFP has acquired an even broader scope of rights in the NFP Logo Mark under common law . . . beyond those expressly listed in the NFP Logo Registrations. . . . NFP began using the NFP Logo Mark in interstate commerce in association with human resources and payroll processing and administration services in January 2012. As a result of such use, NFP has acquired exclusive and enforceable rights in the NFP Logo Mark under common law in association with human resources and payroll processing and administration services.")
[68] NFP Brief, Exh. 1.

services in NFP's registrations show they do not cover Paycom's services.[69] Accordingly, NFP cannot rely in this motion on any presumption of validity afforded registered trademarks.

NFP must, therefore, establish its common law trademark rights to succeed on this motion. *S. Indus.*, 991 F. Supp. at 1018. NFP made no such showing in its opening papers other than to baldly allege it began using the NFP logo in interstate commerce in association with "human resources and payroll processing and administration services in January 2012."[70] However, NFP's own records refute this claim. None of its witnesses have been able to provide basic information about the alleged service; other than repeating the hollow mantra: "NFP has a 'proprietary' payroll processing service."[71] To date, NFP has not produced *any* evidence to substantiate this claim.[72] At most, NFP has produced evidence of its employees recommending a number of third-party payroll processing companies, *including Paycom*, to NFP's clients.[73] This evidence compels the conclusion that NFP is not using its mark in association with payroll administration and information management services.

Moreover, the survey evidence supplied by Dr. Rappeport provides damning evidence that NFP's logo has failed to form any secondary meaning among the relevant consuming public.[74] In the end, NFP has failed to demonstrate that it has a valid, protectable trademark that covers the services it put at issue in this motion—i.e., "(1) employee benefits administration services, (2) employee retirement fund administration services, (3) employee health insurance administration services, and (4) payroll processing, administration and management services".[75]

---

[69] Miller Decl., ¶16
[70] NFP Brief at p. 9.
[71] Sigale Decl., Exh. 1 at 40:10-15, 174:5-176:10; Exh. 2 at 126:6-127:23, 138:24-144:10, 159:7-164:15, Exh. 34.
[72] *See e.g.*, Sigale Decl., Exh. 1 at 174:23-176:2.
[73] Sigale Decl., Exh. 23-25.
[74] Sigale Decl., Exh. 43.
[75] NFP Motion, ¶5.

B.    NFP Cannot Demonstrate a Likelihood of Confusion

"Seven factors comprise the likelihood of confusion analysis: (1) similarity between the marks in appearance and suggestion; (2) similarity of the products; (3) area and manner of concurrent use; (4) degree of care likely to be exercised by consumers; (5) strength of the plaintiff's mark; (6) actual confusion; and (7) intent of the defendant to 'palm off' his product as that of another." *Packman v. Chicago Tribune Co.*, 267 F.3d 628, 643 (7th Cir. 2001). No factor is dispositive, and which factors are most important varies from case to case. *Id*. NFP fails to demonstrate that any of these factors weigh in its favor.

1.    NFP's Marks Are Weak

"The term 'strength' as applied to trademarks refers to the distinctiveness of the mark, or more precisely, its tendency to identify the goods sold under the mark as emanating from a particular . . . source." *Sands, Taylor & Wood Co. v. Quaker Oats Co.*, 978 F.2d 947, 959 (7th Cir. 1992). The strength of a mark usually corresponds to its economic and marketing strength. *Sullivan v. CBS Corp.*, 385 F.3d 772, 777 (7th Cir. 2004).

In general, Paycom does not dispute that logo marks are generally arbitrary and inherently distinctive. Even if valid, in this case NFP's common law mark is weak among customers in payroll administration and information management services. To start, as indicated above, NFP, through its own expert, has not established any connection between consumers in the payroll processing market and its logo.[76] This result is fairly unremarkable. First, a lot of effort is generally required to establish a connection in the consuming public between a logo and single source.[77] NFP has not undertaken this effort. Second, NFP's logo adopted, for the first time in September 2010, uses the same two tones of green that Paycom – who had a strong

---

[76] Sigale Decl., Exh. 43.
[77] Sigale Decl., Exh. 30 at 46:15-47:9.

market presence in the payroll industry – had already been continuously using in association with its marketing collateral and website since 2000.[78] Third, the use of other shades of green are fairly common among companies whose goods or services relate to money.[79] Thus, among money-related service companies, NFP's mark has not achieved any inherent distinctiveness.

Consumer impression of NFP's logo standing-alone is weak because when the NFP logo does appear, it usually does so in association with the better-known acronym for plaintiff, "NFP." See, e.g. *Ziebart International Corp. v. After Market Associates, Inc.*, 802 F.2d 220, 227 (7th Cir. 1986). Beyond that, NFP does not require use of the NFP logo with all of its marketing materials.[80] ███████████████████████████████████████████

███████████████████████████████████████████[81] ███████████

███████████████████████████████████████████

███████████████████████.[82] This inconsistent use combined with the use of the dominant "NFP" name with the logo collectively diminishes any potential customer association between the NFP logo and a single source. Therefore, this factor favors Paycom.

    2.       The Marks Are Not Similar In Appearance And Suggestion

To determine whether the marks are similar, courts must view the marks as a whole "in light of what happens in the marketplace and not merely by looking at the two marks side-by-side." *Ty, Inc.,* 237 F.3d at 898. "[T]he test is not whether the public would confuse the marks, but whether the viewer of an accused mark would be likely to associate the products or service with which it is connected with the source of products or services with which an earlier mark is connected." *Autozone, Inc. v. Strick*, 543 F.3d 923, 930 (7th Cir. 2008). "In comparing two

---

[78] NFP Brief, Exh. 1; Sigale Decl., Exh. 1 at 54:3-55:10; Newman-Wells Decl., ¶ 10.
[79] Sigale Decl., Exhs. 31-32.
[80] Sigale Decl., Exh 1 at 88:16-90:8, 128:16-137:7; Exh. 24; Exh. 33.
[81] Sigale Decl., Exh 1 at 89:11-90:3, 136:21-137:7.
[82] Sigale Decl., Exh 1 at 66:11-17.

marks to determine whether they are confusingly similar, this Circuit follows the rule that 'if one word or feature of a composite trademark is the salient portion of the mark, it may be given greater weight than the surrounding elements.'" *Meridian Mut. Ins. Co. v. Meridian Ins. Group*, 128 F.3d 1111, 1115 (7th Cir. 1997).

As a practical matter, the marks are different. In the marketplace, both Paycom and NFP utilize their logos closely in conjunction with its name. "Prominent display of different names on the marks has been held to reduce the likelihood of confusion even where . . . the marks are otherwise similar." *Ziebart*, 802 F.2d at 227. As such, because both companies use their logo with their names, there necessarily cannot be any confusion. *See e.g.*, *Id.* at 227 (reasoning that when the parties both used a knight's helmet and the company names, there is reduced confusion); *McGraw-Edison Co. v. Walt Disney Productions*, 787 F.2d 1163, 1168-69 (7th Cir. 1986) (marks that use the logo with the company name are not identical); *Sullivan*, 385 F.3d at 777-78 (7th Cir. 2004) (when defendant uses the logo plus the name there was no similarity).

Even the logo portions of the mark are different. First, the NFP logo is ambiguous; appearing to consist of two green interlocking shapes or letters ("c," "u," or "n") separated by a white "2." The Paycom logo clearly depicts the combination of the letters "P" and "C". The NFP logo is hexagon-shaped (NFP claims it is diamond-shaped)[83], while the Paycom logo is a rotated square.[84] The shapes or letters in NFP's logo suggest no particular imagery,[85] while the "P" and "C" in Paycom's logo are intended to suggest the syllables of Paycom's name.[86]

There is no disagreement that both marks have dark and light shades of green. Paycom's logo continues the use of the same green colors Paycom has used since at least 2002. NFP's use

---

[83] Sigale Decl., Exh. 1 at 70:20-71:6; Exh. 2 at 66:15-67:14.
[84] Newman-Wells Decl., ¶ 20.
[85] Dkt. # 1, ¶ 8.
[86] Newman-Wells Decl., ¶ 20.

of these shades of green date back only to September 2010. Arguably, Paycom is the senior user of the two tone green and it may have established secondary meaning as a source identifier for its services prior to NFP's adoption of this color scheme. *Platinum Home Mortgage Corp. v. Platinum Fin. Group, Inc.,* 149 F.3d 722, 728 (7th Cir. 1998). This factor favors Paycom.

> 3. The Services Offered by Paycom and NFP Are At Most Adjacent

"Our inquiry in comparing the two products is not whether they are interchangeable, but whether 'the parties' products are the kind the public might very well attribute to a single source (the plaintiff)." *Autozone*, 543 F.3d at 931.

The services offered by Paycom and NFP have little overlap, regardless of NFP's efforts to suggest otherwise. Paycom is a leading provider of comprehensive cloud-based technology in the field of Human Capital Management.[87] Paycom is a data management company, providing its clients, specifically their human resource department, with a database—containing information about their employees—accessible through Paycom's proprietary software via a web-enabled device.[88] Paycom provides five specific types of information management services: (1) payroll administration, (2) talent acquisition, (3) talent management, (4) HR management, and (5) time and labor management.[89] Paycom's payroll administration allows its clients to transfer the responsibility for paying its employees' wages and salary to Paycom.[90] Paycom will also disseminate notices relating to employee 401K obligations, and ex-employee COBRA obligations but Paycom does not provide 401K or COBRA services.[91] None of Paycom's

---

[87] Miller Decl., ¶3
[88] Miller Decl., ¶¶ 3-4.
[89] Miller Decl., ¶ 16.
[90] Miller Decl., ¶¶ 14, 17.
[91] Miller Decl., ¶ 23.

services overlap with NFP's business. Additionally, Paycom makes a point to distinguish itself from companies such as NFP, by precisely defining the activities it performs for its customers.[92]

In contrast, NFP is a brokerage and consulting company which offers its clients a variety of services and products relating to those services, including retirement plans, 529 plans, insurance, and financial planning.[93] NFP's claim to provide a payroll service appears to be false as it has been unable to provide any evidence to support that assertion.[94] ████████████████████

████████████████████████████████████

████████████████████████████████████

███████████████.[95] ████████████████████

████████████████████████████████████,[96]

████████████████████████████████.[97] Thus, at the most, these businesses are adjacent, and therefore, at the least, this factor is neutral.

4.      Consumers Use Care When Selecting Human Resources Services, Including Payroll Processing Services

When determining whether the customers of services are sophisticated, the court must look at the purchasers of both parties. *Forum Corp. of N. Am. v. Forum, Ltd.*, 903 F.2d 434, 442 (7th Cir. 1990). Generally, the more inexpensive and more widely accessible a service, the more likely consumers will exercise a lesser degree of care. *CAE, Inc. v. Clean Air Eng'g., Inc.*, 267 F.3d 660, 683 (7th Cir. 2001). However, when buying more sophisticated services, such as

---

[92] Newman-Wells Decl., ¶ 50-53; Exh. 5.
[93] NFP Brief at Ex 2, at ¶ 3-4; Sigale Decl., Exh. 1 at 25:9-35:4.
[94] NFP Brief at Ex 2, at ¶ 6; Sigale Decl., Exh. 1 at 40:10-15, 170:17-176:10; Exh. 2 at 126:6-127:23, 138:24-144:10, 159:7-164:15; Exh.34.
[95] Sigale Decl., Exh. 2 at 166:5-167:1.
[96] Sigale Decl., Exh. 1 at 176:11-180:6; Exh. 2 at 142:12-144:10.
[97] Sigale Decl., Exhs. 23-25.

banking and real estate dealings, the services are not entered into lightly, and the customers are sophisticated purchasers. *MB Fin. Bank,* 2003 U.S. Dist. LEXIS 21051, at \*16-17.

NFP does not dispute that consumers of financial services are sophisticated.[98] But, categorizing either NFP's or Paycom's consumers as merely consumers of financial services is misleading. In general, the clients of both NFP and Paycom are companies, not the general public.[99] The client contact is an individual, normally within a human resources department, who is highly skilled and knowledgeable about the needed products and services.[100]

Additionally, the services that both Paycom and NFP provide are sophisticated, and are not purchased on a whim. Specifically, in regards to Paycom, sales representatives work with clients to sell them the best services for their business and there is a substantial amount of back and forth prior to the purchase of the services.[101] Paycom provides demonstrations of its software to prospective clients, and those prospective clients may even contact Paycom's existing clients.[102] ██████████████████████████████████████████████████

██████████████████████████████[103] Additionally, when working with Paycom the client must entrust the company with various types of sensitive employee and client information, which makes licensing Paycom's software a significant purchase.[104] The types of information that clients entrust with Paycom include forms sent to tax authorities, banking knowledge, wage information, and sensitive personal information of the employees, such as addresses and social security numbers, among others.[105] Also, the prospective client must entrust Paycom to meet its

---

[98] NFP Brief at p. 13.
[99] Miller Decl., ¶ 3; Sigale Decl., Exh. 1 at 77:5-22; Exh. 2 at 76:18-77:11.
[100] Miller Decl., ¶¶ 6-8.
[101] Miller Decl., ¶¶ 5-13, 22-23.
[102] Miller Decl., ¶¶ 8, 11.
[103] Miller Decl., ¶ 10.
[104] Miller Decl., ¶ 14.
[105] Miller Decl., ¶¶ 14, 21.

payroll obligations and accurately pay wages or salary, and its employee' taxes, neither of which

any business would take lightly.[106]

Likewise, NFP's consumers are also sophisticated. [107]

[108]

.[109] Thus, similar

to Paycom, NFP's clients are sophisticated. Even if NFP provides the same services as Paycom,

which Paycom disputes, NFP's customers would be equally sophisticated for the same reasons

outlined above for Paycom. Thus, NFP and Paycom's clients are a specialized consumer and

would not enter into transactions lightly. As such, the customers are sophisticated purchasers.

*MB Fin. Bank*, 2003 U.S. Dist. LEXIS 21051, at *16-17.

NFP argues that "consumer high sophistication does not foreclose confusion."[110] But the

cases to which NFP's cites are inapplicable here. In fact, the first case cited by NFP actually

supports Paycom's position. In that case the court noted that "high sophistication does not

foreclose confusion," but determined that "[c]onsumers who buy or lease a vehicle that sells for

more than $ 16,000.00--or, in the case of the H2, more than $ 50,000.00--are likely to use a very

high degree of care, especially since they are likely to make their purchases from well-branded

dealerships." *AM Gen. Corp. v. Daimlerchrysler Corp.*, 311 F.3d 796, 828 (7th Cir. 2002).

Similarly, here, where the customers are businesses purchasing sophisticated payroll services,

they are likely to use a very high degree of care.

The other cases cited by NFP are very fact specific. In *Champions Golf Club*, the court

---

[106] Miller Decl., ¶ 27.
[107] Sigale Decl., Exh. 1 at 28:7-33:9.
[108] Sigale Decl., Exh. 1 at 31:1-32:18.
[109] Sigale Decl., Exh. 1 at 31:1-32:18.
[110] NFP Brief at 13.

analyzed and determined that golfers (albeit sophisticated) would be confused about the affiliation of two golf courses with the same name, and reasoned that when the companies utilize identical names there is a high likelihood of confusion. *Champions Golf Club v. Champions Golf Club*, 78 F.3d 1111, 1121 (6th Cir. 1996). In *Computer Care*, the trade dress of a specific report used by car dealers was infringed because of an identical copy created by the Defendant, and the court determined that even a sophisticated buyer (car dealer) would be confused by an identical copy, if he later saw it after seeing the original. *Computer Care v. Serv. Sys. Enters., Inc.*, 982 F.2d 1063, 1070 (7th Cir. 1992). In both of these cases, the infringing name or trade dress was identical, and so the courts reasoned that even sophisticated buyers would be confused. As set forth above, even if the court were to separate the logo portions from the associated party names, the logos are not identical, and thus, these cases are not applicable. This factor favors Paycom.

5.     There Is No Actual Confusion

The Seventh Circuit has held that *de minimis* evidence of actual confusion is insufficient to prove likelihood of confusion. *Packman*, 267 F.3d at 645. For example, evidence of three individuals out of 257 did not amount to actual confusion. *Sunmark, Inc. v. Ocean Spray Cranberries*, 64 F.3d 1055, 1060 (7th Cir. 1995); *see also*, *Door Sys., Inc. v. Pro--Line Door Sys., Inc.,* 83 F.3d 169, 173 (7th Cir. 1996) (test is whether "any significant number of consumers would be misled"). The Seventh Circuit has also completely discounted evidence as actual confusion where the declarant could not be identified and the statement was paraphrased by the witness who testified about it. *Smith Fiberglass Prods., Inc. v. Ameron, Inc.*, 7 F.3d 1327, 1330-31 (7th Cir. 1993). Additionally, instances of confusion expressed by persons who are not actual consumers of the products sold under the marks are entitled to little weight. *MB Fin. Bank*, 2003 U.S. Dist. LEXIS 21051, at *20-21; *see also*, *Hydrox Chem. Co. v. Diversey, Inc.*, 2015 U.S.

Dist. LEXIS 36276, *41-43 (N.D. Ill. March 23, 2015) (testimony of a non-customer "personal friend of Plaintiff's owner and a paid sales consultant for Plaintiff's products" is not evidence of consumer confusion). The focus should be on the confusion of the "end-user consumers . . . rather than delving into the issue of whether or not the middleman was confused." *MB Fin. Bank*, 2003 U.S. Dist. LEXIS 21051, at *20.

NFP has identified five instances of purported "actual confusion;"[111] but those instances are either not consumers or NFP never proved the witnesses were actually confused. We address each instance in turn.

The first occurred on July 15, 2014. Brett Shumate, a District Manager for ADP (an actual competitor of Paycom) based in Oklahoma City sent an e-mail to Cooper Johnson, an NFP Vice President of Sales, inquiring as to whether "there was an acquisition between [NFP and Paycom] that we were not aware of, as I have noticed that your logos are now identical."[112] When asked about the e-mail in his deposition, ███████████████████████████

███████████████████████████████████████████████

███████████████████████████████████████████████

███████[113] ██████████████████████████████████████████

███████████████████████████████████.[114] ████████████

███████████████████████████████████.[115] Mr. Shumate complied with Mr. Hudelson's request.[116] Mr. Shumate testified that he considers Paycom a competitor of ADP in the areas of payroll, time and attendance solutions, and human

---

[111] Sigale Decl., Exh. 35 at p. 3.
[112] Sigale Decl., Exh. 35 at p. 3.
[113] Sigale Decl., Exh. 35 at p. 3.
[114] Sigale Decl., Exh. 36 at 21:1-22:14.
[115] Sigale Decl., Exh. 36 at 35:24-36:4.
[116] Sigale Decl., Exh. 36 at 36:21-22.

capital management.[117] Therefore, ADP is not a prospective purchaser of Paycom's services. As

such, this evidence – from a non-consumer of the services at issue – should be given little, if any,

weight. *See e.g. MB Fin. Bank*, 2003 U.S. Dist. LEXIS 21051, at *20-21.

The second purported instance of "actual confusion" was recorded on July 21, 2014.[118]

Rulissa Trout, the Vice President of Human Resources for Asset Plus Corp., a client ***and former***

***employee*** of NFP-MHA, sent an e-mail to Mr. Hudelson, inquiring as to whether NFP-MHA was

"connected with the Paycom team."[119] Mrs. Trout testified in deposition that she sent the e-mail

in response to her attention being drawn to a billboard bearing the Paycom logo in the Oklahoma

City area by her husband.[120] Mrs. Trout, by her own admission, is not an "end-user consumer" of

the services at issue in this litigation, and therefore, her e-mail is not proof of "actual confusion."

The third purported instance of "actual confusion" occurred in approximately November

2014.[121] Jolinda Ross, a representative of Integrative Medical Solutions, an alleged client of

NFP-MHA, asked Mr. Hudelson about the relationship between NFP and Paycom.[122] NFP did

not provide any evidence that this question stemmed from a similarity of the logos; nor did they

provide a declaration of Ms. Ross. As such, this evidence must be completely discounted as any

proof of "actual confusion" as it is unsupported. *Smith Fiberglass*, 7 F.3d at 1330-31.

The fourth purported instance of "actual confusion" occurred in approximately December

2014.[123] Kristi Kromer-Jones, Vice President of Human Resources for Great Plains National

Bank, allegedly a client of NFP-MHA, asked Jordan Cook, a benefits consultant for NFP-MHA,

whether there was a relationship between NFP and Paycom due to the similarities in the

---

[117] Sigale Decl., Exh. 36 at 38:24-39:15.
[118] Sigale Decl., Exh. 35 at p. 3.
[119] Sigale Decl., Exh. 35 at p. 3.
[120] Sigale Decl., Exh. 37 at 25:2-27:5.
[121] Sigale Decl., Exh. 35 at p. 4.
[122] Sigale Decl., Exh. 35 at p. 4.
[123] Sigale Decl., Exh. 35 at p. 4.

companies' logos.[124] NFP did not provide a declaration of Ms. Kromer-Jones or Mr. Cook. As such, this evidence must be completely discounted as proof of "actual confusion" because it is unsupported. *Smith Fiberglass*, 7 F.3d at 1330-31.

The fifth purported instance of "actual confusion" occurred in approximately February 2015.[125] A representative of Senior Star Management Company, a client of NFP-MHA, allegedly asked Thad Ledford, a Vice President for Sales for NFP-MHA, about the relationship between NFP and Paycom.[126] NFP has not provided any details about the identity of the representative of Senior Star Management Company, and it is not even clear the question related to the logo. Accordingly, the Court must discount this alleged instance of actual infringement, as well.[127]

For the sixth and final purported instance of "actual confusion" Mr. Boester's testified that while preparing for his deposition he learned of an additional instance of confusion from NFP's Charlotte office.[128] Mr. Boester was unable to testify to the client name, the services used by the client, when the purported instance of confusion occurred, and even whether the confusion even involved Paycom's logo.[129] Consequently, this episode should be disregarded, too.

Overall, the purported instances of actual confusion that NFP has identified do not prove any actual confusion, and to date, more than one year after the introduction of Paycom's new logo in the marketplace, NFP cannot identify any other instances of alleged customer confusion. Moreover, the expert reports do not support a finding of actual confusion.[130] Thus, NFP has failed to produce any evidence on this factor, accordingly this factor favors Paycom.

---

[124] Sigale Decl., Exh. 35 at p. 4.
[125] Sigale Decl., Exh. 35 at p. 4.
[126] Sigale Decl., Exh. 35 at p. 4.
[127] Sigale Decl., Exh. 38 at 53:24-55:6.
[128] Sigale Decl., Exh. 2 at 211:15-22.
[129] Sigale Decl., Exh. 2 at 212:10-213:23.
[130] Sigale Decl., Exh. 22 at p.18, line 12-17.

6.     Paycom Had No Bad Intent When Selecting Its Mark

There is no relevant intent when there was no intent to confuse customers. *Meridian Mut.*, 128 F.3d at 1119. NFP's Brief acknowledges that it has no evidence that Paycom deliberately chose to mimic the NFP logo.[131] However, NFP surmises because the marks are similar "down to the common use of two shades of green" that it "seems beyond coincidence" that Paycom selected its new logo without intending to copy NFP.

The real evidence shows that Paycom had no intent to confuse customers, or to even "mimic" the NFP logo. The real evidence shows that Paycom has always used a green logo. The evidence further shows that Paycom has used nearly the same two shades of green – found in the current logo – in its marketing collateral for nearly a decade. The real evidence also shows that before adopting the mark Paycom did an investigation of other payroll administration and HR information management services companies to avoid choosing a logo similar to that of a competitor.[132] Further, the evidence shows that Paycom had a trademark clearance report conducted before adopting the new logo.[133] NFP's logo was not identified in the search.[134] Therefore, this factor favors Paycom.

7.     The Parties Offer Their Services in Different Marketing Channels

To determine whether the parties' logos have the same "area and manner of use" the analysis requires the resolution of "[w]hether there is a relationship in use, promotion, distribution, or sales between the goods or services of the parties." *Forum Corp.*, 903 F.2d at 442. There is no likelihood of confusion where the parties' products are not in direct competition. *Smith Fiberglass*, 7 F.3d at 1330. Paycom and NFP are not competitors. As set

---

[131] NFP Brief at p. 15.
[132] Newman-Wells Decl., ¶ 13.
[133] Sigale Decl., Exh. 39.
[134] Sigale Decl., Exh. 39 at 5-39.

forth above, Paycom and NFP offer significantly different services. Also, there is evidence that NFP promotes Paycom to its customers as a payroll provider.[135] This factor favors Paycom.

C.    Abandonment Due to Naked Licensing

There is substantial evidence that NFP has abandoned its mark. A trademark owner can abandon all trademark rights through uncontrolled or "naked" licensing. *TMT N. Am. Inc. v. Magic Touch GmbH*, 124 F.3d 876, 885 (7th Cir. 1997). Naked licensing is found when the trademark holder allows others to use the mark without exercising "reasonable control over the nature and quality of the services on which the [mark] is used by the licensee." *Eva's Bridal, Ltd. v. Halanick Enters.*, 639 F.3d 788, 789 (7th Cir. 2011). The amount of control necessary is the amount required for the licensor to "insure that the licensee's goods or services would meet the expectations created by the presence of the trademark." *Id*. at 790. The Seventh Circuit allows "licensors to rely at least somewhat on the reputation and expertise of the licensee." *TMT*, 124 F.3d at 885. However, the Seventh Circuit has also reasoned the quality of the mark remains with the trademark owner, and the amount of authority required over that mark is dependent on the nature of the business and the customer expectations. *Eva's Bridal*, 639 F.3d at 791. In instances where the trademark owner exercises no control over the trademark, there is naked licensing. *Id*.

███████████████████████████████████████████████████

███████████████████████████████████████████████████

███████████████████████████████████[136]████████████████

███████████████████████████.[137]  NFP has membership agreements, which incorporate various standards and requirements, including requirements with respect to

---

[135] Sigale Decl., Exh. 23-25.
[136] Sigale Decl., Exh. 1 at 66:11-17.
[137] Sigale Decl., Exh 1 at 88:16-90:8, 128:16-137:7; Exh. 24; Exh. 33.

trademark usage, which it intended to use with each of its members.[138]



As such, NFP cannot show it exercises reasonable control over its licensees, which is shows naked licensing, and an abandonment of NFP's mark. *See*, *Nat. Conf. of Bar Examiners v. Multistate Legal Studies, Inc.*, 692 F.2d 478, 488 (7th Cir. 1982)(burden of proving validity lies with owner of unregistered mark).

## III.  THE BALANCING OF THE HARDSHIPS FAVORS PAYCOM

To obtain a preliminary injunction, NFP must show that the balance of hardships tips in its favor. *Winter*, 555 U.S. at 20. The more likely it is the plaintiff will succeed on the merits, the less the balance of irreparable harms need weigh towards its side; the less likely it is the plaintiff will succeed, the more the balance needs to weigh towards its side. *Storck USA L.P. v. Farley Candy Co.*, 14 F.3d 311, 314 (7th Cir. 1994). "Even if a plaintiff's suit appears to have merit, an injunction should not necessarily issue if the harm to the defendant would substantially outweigh the benefit to the plaintiff." *Michigan v. U.S. Corps of Army Engineers*, 667 F.3d 765, 789 (7th Cir. 2011). In weighing the balance of harms, courts consider economic burdens such as the financial investment made to develop and promote a product, and the cost of re-branding or removing the allegedly infringing mark.  *See e.g.*, *Ty, Inc.*, 237 F.3d at 902-03; *EnVerve Inc., v. Unger Meat Co.*, 779 F. Supp. 2d 840, 845 (N.D. Ill. 2011); *Vienna Beef, Ltd. v. Red Hot Chi., Inc.*, 833 F. Supp. 2d 870, 877 (N.D. Ill. 2011). NFP has not and cannot establish the balance of

---

[138] Sigale Decl., Exh. 1 at 96:18-98:3; Exh. 2 at 99:2-100:7, 113:14-114:10; Exh. 41; Exh. 42.
[139] Sigale Decl., Exh. 2 at 112:6-113:11.
[140] Sigale Decl., Exh. 2 at 101:5-111:18.

harms tips in its favor, because of the harm that weighs heavily in favor of Paycom. Paycom's new logo incorporates Paycom's well-known color scheme that has established brand recognition across various industries.[141] Paycom has been using a green color scheme for more than a decade[142] ensuring consistent usage using the Pantone Color Guide.[143]

Paycom invested ████████████ and substantial time developing and promoting its new logo, which included researching competitor logos, hiring design agencies, developing the decided upon logo, obtaining legal services for searching and registration, and ultimately rolling out the new logo to the public.[144] The rollout included installing the new logo at its thirty-five offices throughout the country, both internally and externally, purchasing and utilizing billboard space for advertising, and developing other advertising products, such as a tradeshow booth, career fair booth, and sports stadium signage.[145] Paycom has also utilized the logo on marketing collateral, business cards, their website, in web advertising, and in the software provided to its clients, among others.[146] Paycom has invested a significant amount of money establishing goodwill and brand recognition in its new logo with these marketing and advertising efforts.████

██████████████████████████████████████████████████████████

███████████████████.[147] NFP's Motion attempts to minimize the cost of removing Paycom's logo.[148] Paycom will need to do much more than remove the logo from "its website and advertising" materials. Paycom will need to ████████████████████████

████████████████ including the development and promotion of whichever logo it adopts,

[141] Newman-Wells Decl., ¶ 4-11.
[142] Newman-Wells Decl., ¶ 6-11.
[143] Newman-Wells Decl., ¶ 10.
[144] Newman-Wells Decl., ¶ 13-14, 17-46.
[145] Newman-Wells Decl., ¶ 37-46.
[146] Newman-Wells Decl., ¶ 23-36.
[147] Newman-Wells Decl., ¶ 54-56.
[148] NFP Brief at pg. 18.

because Paycom will not remain logo-less while this litigation is ongoing. Paycom has always had a green logo, and will need to continue to have a green logo to maintain its brand recognition. Not only will Paycom have to update its marketing and advertising collateral, but it will also have to update the software products that it sells to its customers which greatly incorporate Paycom's logo. Thus, the entry of an injunction will also require significant technical resources and man-hours. Paycom's logo is intertwined within every aspect of its business, and re-branding will not be an easy task. Thus, the cost of a preliminary injunction against Paycom will be anything but insignificant. Consequently, the balances of harms tip heavily against NFP, and in favor of Paycom. *EnVerve*, 779 F. Supp. 2d at 845.

## IV.  THE PUBLIC INTEREST WEIGHS IN FAVOR OF PAYCOM

NFP indicates that the "public has the right to not be confused or defrauded as to the source of the services offered by Paycom . . ." However, NFP has provided proof that the "public" is not confused.[149] In trying to prove "actual confusion," NFP identified members of the general public who now maintain that they were not confused at all. *Vienna Beef*, 833 F. Supp. at 877 (reasoning that without customer confusion there is no need to protect the public interest).

## V.  IF A PRELIMINARY INJUNCTION IS ENTERED, THE REQUIRED BOND AMOUNT SHOULD BE SIGNIFICANT

If a preliminary injunction is issued, Paycom will have to re-brand.  Development and promotion of a new logo will undoubtedly be costly.  If NFP ultimately cannot prove trademark infringement, then Paycom would be entitled to recover the costs of re-branding. NFP is a privately-held company. As such, it is impossible for Paycom to determine whether NFP is a "financially sound corporation" with "adequate financial resources" that will be able to pay the damages sustained by Paycom. Under these circumstances, a significant bond is appropriate. *Ty,*

---

[149] *infra* IIB5.

REDACTED - PUBLIC VERSION

*Inc.*, 237 F.3d at 903 ($500,000 bond appropriate where the defendant would need to re-brand).


Dated:  April 30, 2015                     By:     /s/ *Jordan A. Sigale*
                                                   Douglas J. Sorocco  (ARDC No. 2381747)
                                                   Joseph P. Titterington
                                                   DUNLAP CODDING PC
                                                   609 West Sheridan Avenue
                                                   Oklahoma City, OK 73102
                                                   Telephone: (405) 607-8600
                                                   Facsimile: (405) 607-8686
                                                   jtitterington@dunlapcodding.com
                                                   dsorocco@dunlapcodding.com


                                                   Jordan A. Sigale, (ARDC No. 6210047)
                                                   DUNLAP CODDING PC
                                                   222 Merchandise Mart Plaza, Suite 1225
                                                   Chicago, IL  60654
                                                   Telephone: (312) 651-6744
                                                   Facsimile:  (312) 546-6284
                                                   jsigale@dunlapcodding.com

                                                   **Attorneys for Defendants Paycom**
                                                   **Software, Inc. and Paycom Payroll, LLC**

REDACTED - PUBLIC VERSION

## <u>CERTIFICATE OF SERVICE</u>

I certify that on May 28, 2015, I electronically transmitted the foregoing document to the

Clerk of the Court using the ECF system for filing and transmittal of a Notice of Electronic

Filing to the following ECF registrants:

Richard D. Harris
Jeffrey P. Dunning
Matthew J. Levinstein
Paul A. Del Aguila
GREENBERG TRAURIG LLP
77 West Wacker Drive
Suite 3100
Chicago, IL  60601
Tel:  (312)  456-8400
Fax:  (312)  456-8435
harrisr@gtlaw.com
dunningj@gtlaw.com
levinsteinm@gtlaw.com
delaguilap@gtlaw.com


/s/*Jordan A. Sigale*
Jordan A. Sigale