**IN THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF ILLINOIS
EASTERN DIVISION**

| | |
|---|---|
| NATIONAL FINANCIAL PARTNERS CORP., ) | |
| ) | |
| Plaintiff, ) | |
| ) | |
| vs. ) | No. 14 C 7424 |
| ) | |
| PAYCOM SOFTWARE, INC. and ) | |
| PAYCOM PAYROLL, LLC, ) | |
| ) | |
| Defendant. ) | |

## <u>MEMORANDUM OPINION AND ORDER</u>

MATTHEW F. KENNELLY, District Judge:

National Financial Partners Corp. (NFP) has sued Paycom Software, Inc. and

Paycom Payroll, LLC (together, Paycom), alleging that Paycom's logo infringes NFP's

trademark rights.  NFP has alleged trademark infringement under sections 32 and 43(a)

of the Lanham Act (counts 1 and 2), violations of the Illinois Uniform Deceptive Trade

Practices Act, 815 ILCS 510/2 (count 3), violations of the Illinois Consumer Fraud and

Deceptive Business Practices Act, 815 ILCS 505/2 (count 4), and common law unfair

competition (count 5).  NFP has moved for a preliminary injunction barring Paycom from

using its logo.  The Court held an evidentiary hearing on May 7, 8, and 15, 2015.  This

opinion constitutes the Court's findings of fact and conclusions of law pursuant to

Federal Rule of Civil Procedure 52(a)(2).

## Background

NFP is a financial services company that offers investment and brokerage

services and corporate benefits and consulting services.  As part of its corporate

benefits business, which makes up roughly seventy percent of its revenues, NFP offers financial products and consulting services related to employer health plans, retirement plans, and executive benefits.  5/7/2015 Tr. 12–14 (Boester testimony); Pl.'s Hr'g Ex. 1 at 4.  Beginning in March 2013, NFP expanded its offerings to include human resources services, including "training of talent, compensation strategies, [human resources] and benefits administration, payroll policies and procedures, [and] call center for employee questions."  5/7/2015 Tr. 183 (O'Malley testimony).

NFP adopted and began using its current logo in 2010.  *Id.* at 31.  The logo, depicted below, consists of "a design of two interlocking shapes that form a hexagon with the left element in dark green and the right element in light green."  Pl.'s Hr'g Ex. 12 (NFP's trademark registrations).  NFP refers to its logo as "the interlink."  5/7/2015 Tr. 32.  NFP obtained multiple federal trademark registrations for the interlink logo, including in color and in black-and-white.  NFP also obtained registrations for the mark when used in combination with "NFP," "BenefitsPartners," and "PartnersFinancial."  Pl.'s Hr'g Ex. 12 (trademark registration numbers 4,094,886, 4,094,887, 4,094,885, 4,097,433, 4,420,178, and 4,094,882).



NFP owns about 120 companies, all of which use the NFP interlink in connection with their names.  5/7/2015 Tr. 8.  The Court heard extensive testimony about one of

these affiliated companies, Maschino, Hudelson & Associates (NFP-MHA). *See, e.g.*, *id.* at 67. NFP also allows roughly 400 members of its two membership organizations, Benefits Partners and Partners Financial, to use the NFP interlink logo but not the NFP name. *Id.* at 8–10. Neither of these organizations nor their members are owned by NFP.

Before it adopted its current logo in 2010, NFP used a logo with two diamonds depicted in dark green. NFP created the new interlink logo as part of a broader rebranding effort designed to emphasize the connection between NFP and its owned and member companies. Pl.'s Hr'g Ex. 4. Eric Boester, NFP's vice president of corporate development, testified that this effort was referred to internally as "one NFP," and its purpose was to "pull[] together all of the operating subsidiaries that used to operate in a relatively independent fashion under a common look and feel of the NFP logo." 5/7/2015 Tr. 27, 30. The new NFP logo with green interlocking diamonds was designed to represent the close partnerships between NFP and its subsidiaries while also referring to the old logo. *Id.* at 31; Pl.'s Hr'g Ex. 4.

Paycom offers payroll administration and data management services for employers that range in size from "one employee to several thousand employees." 5/15/2015 Tr. 462 (Miller testimony). Paycom's primary business is payroll administrative services, although the company also offers information management software systems in the areas of talent acquisition, talent management, human resources management, and time and labor management. *Id.* at 459–60. Paycom licenses its proprietary software and database services to over 12,000 clients. *Id.* at 462.

In February 2014, Paycom adopted the logo at issue in this case. The logo consists of the "interlocking stylized letters P and C," with "P" depicted in dark green and "C" depicted in light green. Pl.'s Hr'g Ex. at 1. Paycom uses two versions of the mark—a three-dimensional version with a gradient (depicted below on the left) and a two-dimensional version without a gradient (depicted below on the right). Amy Newman-Wells, director of marketing at Paycom, testified that the three-dimensional version is the preferred logo but that the two-dimensional version is used on Paycom's Brand Standards Guide, its website, the sign in front of its headquarters, some of its marketing materials, and employees' e-mail signatures. 5/8/2015 Tr. 280, 283–84.



Newman-Wells testified credibly that she conceptualized the new logo without knowledge of NFP's logo. 5/15/2015 Tr. 361. Paycom changed its website to include the new logo in late February 2014 and began to use the logo on its promotional materials in March 2014. 5/8/2015 Tr. 276, 279; 5/15/2015 Tr. 367–68. Newman-Wells, along with Paycom's chief marketing officer and one of Paycom's attorneys, discovered NFP's logo on March 24, 2014 when a Paycom employee e-mailed them to note the similarity between the two logos. 5/15/2015 Tr. 314–15; Pl.'s Hr'g Ex. 33. Paycom filed a trademark application with the U.S. Patent and Trademark Office for the three-dimensional version of its mark on June 12, 2014. It did not mention NFP's mark

in the application.  Pl.'s Hr'g Ex. 31.

NFP argues that Paycom has infringed its trademark rights because the mark causes confusion regarding affiliation.  NFP contends that it will be irreparably harmed in the absence of a preliminary injunction.

### Discussion

"A party seeking to obtain a preliminary injunction must demonstrate:  (1) its case has some likelihood of success on the merits; (2) that no adequate remedy at law exists; and (3) it will suffer irreparable harm if the injunction is not granted."  *Ty, Inc. v. Jones Grp., Inc.*, 237 F.3d 891, 895 (7th Cir. 2001).  If the Court concludes that those conditions have been met, "then it must consider the irreparable harm that the nonmoving party will suffer if preliminary relief is granted, balancing such harm against the irreparable harm the moving party will suffer if relief is denied."  *Id.*  The Court must also consider the public's interest.  *Id.*

### A.    Likelihood of success on the merits

NFP has brought claims under section 32 and section 43(a) of the Lanham Act, 15 U.S.C. §§ 1114(1), 1125(a), as well as claims under state law.  NFP's state law claims are assessed under the same standard as its federal claims.  *See Morningware, Inc. v. Hearthware Home Prods., Inc.*, 673 F. Supp. 2d 630, 639 (N.D. Ill. 2009) ("Where a plaintiff's factual allegations under the Illinois Uniform Deceptive Trade Practices Act also form the basis for plaintiff's claims under the Lanham Act, the legal inquiry is the same under both statutes.");  *Spex, Inc. v. Joy of Spex, Inc.*, 847 F. Supp. 567, 579 (N.D. Ill. 1994) ("Claims for unfair competition and deceptive business practices brought

under Illinois statutes are to be resolved according to the principles set forth under the Lanham Act.").

A plaintiff can obtain relief under section 32 only for infringement of a registered mark, but a plaintiff can recover under section 43(a) for infringement of an unregistered mark. *See Two Pesos, Inc. v. Taco Cabana, Inc.*, 505 U.S. 763, 768 (1992) ("[I]t is common ground that § 43(a) protects qualifying unregistered trademarks."). To prevail under either section, NFP "must establish that (1) its mark is protectable and (2) the defendant's use of the mark is likely to cause confusion among consumers." *CAE, Inc. v. Clean Air Eng'g, Inc.*, 267 F.3d 660, 673–74 (7th Cir. 2001); *see also McGraw-Edison Co. v. Walt Disney Prods.*, 787 F.2d 1163, 1167 (7th Cir. 1986). At the preliminary injunction stage, NFP need only demonstrate that it has a "better than negligible chance of succeeding on the merits." *Ty, Inc.*, 237 F.3d at 897.

### 1. Validity of NFP's mark

NFP is entitled to a rebuttable presumption of the validity of its registered mark and of its exclusive right to use the mark in connection with the goods or services specified in its trademark registration. *See* 15 U.S.C. § 1115(a); *CAE, Inc.*, 267 F.3d at 673. Paycom argues that NFP cannot benefit from the presumption because its registrations do not extend to the services that Paycom offers.

Paycom is correct that NFP and Paycom's core businesses differ. Paycom is primarily a technology company that offers human resources software systems. NFP primarily offers financial services and brokerage and consulting services related to employer health plans, retirement plans, and executive benefits. Beginning in March 2013, however, NFP expanded its offerings to include human resources services.

5/7/2015 Tr. 183 (O'Malley testimony).  At the hearing, there was extensive testimony concerning whether NFP offers payroll and benefits administration services.  Edward O'Malley, executive vice president and president of NFP's insurance and brokers' division, testified that with respect to "vendor and technology evaluation," NFP "operate[s] primarily as consultants, where we go out and identify, based on the needs of the employer, the unique criteria of the employer or customer, what technologies best fit or suit their needs."  *Id.* at 187–88.  In other words, NFP generally identifies third parties to provide payroll and benefits administration technology for its clients.  In fact, evidence was presented that NFP has recommended Paycom as a possible vendor to its clients.  *Id.* at 204–05.  Although NFP does not offer payroll processing technology to most of its clients, O'Malley testified that NFP does have its own proprietary technology for processing payroll.  *Id.* at 188–89.  This testimony arguably conflicted with Boester's. When asked if NFP's benefits group "actually [has] any of its own software," Boester stated that the group has "leveraged other software."  *Id.* at 90.  The Court need not resolve this apparent conflict.  Whether or not NFP outsources all or most of its payroll and benefits administration functions, NFP's human resources services overlap with Paycom's payroll and benefits administration business.  Both target employers to assist with their human resources administration needs.

Paycom attempts to distinguish between NFP's human resources services, which correspond to international class 36 of the Trademark Manual of Examining Procedure, and Paycom's services, which correspond to international class 35.  NFP's marks are registered under class 35 and class 36.  Pl.'s Hr'g Ex. 31 (Paycom's trademark

application); Pl.'s Hr'g Ex. 12 (NFP's trademark registration).[1]  Even though NFP's employee benefits brokerage and consulting services are listed under class 36, there is nonetheless overlap in the parties' trademark registration classifications.  More importantly, there is also overlap in the parties' descriptions of their respective services. NFP's registration application describes its services as including "brokerage and consulting services for employee benefits concerning insurance and finance, namely . . . consulting and administrative services for executive benefits plans."  Pl.'s Hr'g Ex. 12. Paycom's application describes its services as including "payroll administration and management services; human resources management; [and] performing employee benefits administration."  Pl.'s Hr'g Ex. 31.  In short, both parties list benefits administration as a service they provide.

This overlap is sufficient for the Court to conclude that NFP's trademarks cover the services offered by Paycom.  "The rights of an owner of a registered trademark extend to any goods or services that, in the minds of consumers, might be put out by a single producer."  *AutoZone, Inc. v. Strick*, 543 F.3d 923, 931 (7th Cir. 2008).  This case is like *Sands, Taylor & Wood Co. v. Quaker Oats Co.*, 978 F.2d 947 (7th Cir. 1992), in which the court found that plaintiff's registration rights for beverage syrups also encompassed beverages.  *Id.* at 955 (declining to conclude that plaintiff "had no registration rights covering the use of THIRST–AID on beverages," because "[w]e do not see the wide gulf between a trademark for beverage *syrups* and a trademark for beverages").  The parties' services are not so unrelated that the trademark registration

---

[1] Class 36 includes "[i]nsurance; financial affairs; monetary affairs; real estate affairs," whereas class 35 includes "[a]dvertising; business management; business administration; office functions."  U.S. Patent & Trademark Office, Trademark Manual of Examining Procedure § 1401.02(a) (2015).

does not cover the services offered by Paycom. *Cf. S Indus., Inc. v. Diamond Multimedia Sys., Inc.*, 991 F. Supp. 1012, 1017 (N.D. Ill. 1998) (finding that "the goods in plaintiff's registrations," which included sporting goods, lawn sprinklers, pool and billiard equipment, fishing tackle floats, and other items, were "so unrelated to [the defendant's] computer video and graphics computer boards that defendants' use of [the mark] cannot infringe plaintiff's registered [ ] marks"). Human resources technology and human resources consulting and financial services are similar enough that a consumer might conclude that the types of services provided by NFP and Paycom are offered by the same company.

Moreover, an important reason to protect "trademark owners against the use of similar marks on closely related products is to protect the owner's ability to enter product markets in which it does not now trade but into which it might reasonably be expected to expand in the future." *Sands, Taylor & Wood*, 978 F.2d at 958. Put differently, "[t]he Lanham Act aims to protect the trademark owner's interest in capitalizing on the good will associated with its mark by moving into new markets." *CAE, Inc.*, 267 F.3d at 681 (internal quotation marks omitted). NFP started to expand its business to include human resources services and administration in 2013, with preparation for this expansion beginning in 2012. Even if this part of its business is currently rather small, NFP is entitled to capitalize on its trademark protection to help expand into this related market.

Paycom argues that the presumption of validity has been rebutted because Paycom is actually the senior user of the mark. NFP must be the first user of the mark to be entitled to trademark protection. *See G. Heileman Brewing Co. v. Anheuser-*

*Busch, Inc.*, 873 F.2d 985, 999 (7th Cir. 1989); *Zazu Designs v. L'Oreal, S.A.*, 979 F.2d 499, 503 (7th Cir. 1992); *A.J. Canfield Co. v. Honickman*, 808 F.2d 291, 297 (3d Cir. 1986). Paycom argues that it is the senior user because it started using two shades of green in its marketing materials (though not in its logo) in 1998. Def.'s Hr'g Ex. 16 (Paycom's old marketing materials). But the mark in question is NFP's interlink logo consisting of interlocking diamonds depicted in two shades of green, not simply two shades of green. NFP created the interlink logo in 2010 and began to use that mark for human resources services in 2013. Paycom did not create the allegedly infringing mark until 2014. Thus, NFP is the senior user. In sum, NFP has a valid trademark that covers the services offered by Paycom.

### 2. Likelihood of confusion

The Court considers seven factors to determine whether there is a likelihood of confusion:

> (1) the similarity of the marks in appearance and suggestion; (2) the similarity of the products; (3) the area and manner of concurrent use; (4) the degree of care likely to be used by consumers; (5) the strength of the plaintiff's mark; (6) whether any actual confusion exists; and (7) the defendant's intent to palm off its goods as those of the plaintiffs.

*Ty, Inc.*, 237 F.3d at 897. Although "[n]o single factor is dispositive," the most important factors are often "the similarity of the marks, the defendant's intent, and actual confusion." *CAE, Inc.*, 267 F.3d at 678.

### a. Similarity of marks, products, and use

The first factor, similarity of the marks, favors NFP. The test for similarity is "not whether the public would confuse the marks, but whether the viewer of an accused mark would be likely to associate the product or service with which it is connected with

the source of products or services with which an earlier mark is connected." *AutoZone,*
*Inc.*, 543 F.3d at 930 (internal quotation marks omitted). The marks are similar enough
that a viewer would be likely to associate Paycom's services with NFP's services.
Indeed, Paycom admits that the marks are very similar in appearance. 5/15/2015 Tr.
534 (closing argument of Paycom's attorney, Jordan Sigale). As additional support,
NFP has offered evidence that several of Paycom's own employees commented on the
logos' similarity. For instance, when presented with NFP's mark, Paycom's chief
marketing officer remarked, "Whoa! That's pretty close." Pl.'s Hr'g Ex. 33 at 5. A
Paycom client relationships representative commented that NFP and Paycom "have a
similar logo." *Id.* at 6. And a Paycom specialist wrote, "Uhhhhh does that not look like
our logo?!" *Id.* at 10.

The second factor, the similarity of the products, also favors NFP. The Court
must consider whether NFP and Paycom's products and services are closely related.
*Ty, Inc.,* 237 F.3d at 899–900. "[A] closely related product [or service] is one which
would reasonably be thought by the buying public to come from the same source, or
thought to be affiliated with, connected with, or sponsored by, the trademark owner." *Id.*
at 900. To be closely related, products or services need not be identical or in direct
competition. Rather, the products or services must be "the kind the public might very
well attribute to a single source." *Int'l Kennel Club of Chi., Inc. v. Mighty Star, Inc.,* 846
F.2d 1079, 1089 (7th Cir. 1988) (plaintiff who sponsored dog shows and defendant who
created dog toys offered related products); *see also AutoZone, Inc.*, 543 F.3d at 931
(ruling that a reasonable consumer could conclude that plaintiff's automobile products
and defendant's automobile services came from the same source). NFP and Paycom

both offer services related to human resources management. Although NFP primarily offers consulting and financial services and Paycom primarily offers software products, a consumer reasonably would think that one company offered all of these services. NFP and Paycom market their services to the same general audience, namely executives who make human resources decisions. *See AutoZone, Inc.*, 543 F.3d at 932 ("[B]oth parties here operate automotive-oriented businesses that target segments of the general automobile-using public."). This "industrial affinity between their products and services [ ] is likely to increase consumer confusion if both parties market their products and services in connection with the . . . mark." *CAE, Inc.*, 267 F.3d at 681.

For similar reasons, the third factor, area and manner of concurrent use, also favors NFP. Both parties promote their services nationally "in the same channels of commerce" and "have targeted the same general audience." *Id.* at 681–82; *see also AutoZone, Inc.*, 543 F.3d at 932. Thus, this factor weighs in favor of a finding of likelihood of confusion.

### b. Degree of care and strength of the mark

The fourth factor, degree of care exercised by consumers, does not favor either party. Zachary Miller, a regional sales manager for Paycom, testified that Paycom's customers "exercise an extreme amount of care" in deciding whether or not to enter into an agreement with Paycom, because "[t]hey are trusting us with huge financial transactions, generally the largest financial transactions that happen in any given business." 5/15/2015 Tr. 454. Miller estimated that it "takes five to seven meetings over four to six weeks to close a deal with a new client," and the set-up fee for Paycom's services ranges from a few thousand dollars to up to $50,000. Def.'s Hr'g.

12

Ex. 44 ¶ 10 (Miller declaration); 5/15/2015 Tr. 454. This testimony was credible. Nonetheless, "customers' technical sophistication about their particular industry does not equate to trademark sophistication." *CAE, Inc.*, 267 F.3d at 683. The fact that consumers exercise considerable care in selecting human resources service providers does not mean that those consumers would not be confused as to affiliation based on the two logos. In fact, Brett Shumate and Rulissa Trout, who both work in the human resources field, were confused as to the relationship between NFP and Paycom, as the Court discusses in the next section. *See* Pl.'s Hr'g Ex. 14 (e-mails from Trout and Shumate expressing confusion about the relationship between NFP and Paycom). This suggests that insiders in the industry could be confused by the logos' similarity.

The fifth factor, the strength of the plaintiff's mark, does not favor either party. Even though NFP's mark is arbitrary, that classification does not necessarily mean the mark is strong in the areas in which Paycom offers services. *See Sullivan v. CBS Corp.*, 385 F.3d 772, 777 (7th Cir. 2004) ("A mark can be arbitrary for one purpose but it may still be used extensively in other areas."). "The crucial question is whether the mark is strong enough that the public will form an association between the mark and the source of that particular good." *Id.* As Boester testified, NFP has invested substantial resources in advertising and promoting its services under its mark, and the mark conveys the concept that NFP's owned entities and member organizations operate as "one NFP." 5/7/2015 Tr. 30–31. However, NFP has not presented evidence that potential customers recognize the logo as NFP's. In fact, when NFP's expert, Dr. Michael Rappeport, asked survey respondents, who were all involved in human resources, whether they had seen the NFP logo before, eleven out of 180 had seen it.

None of those eleven could identify the company that used the logo. *Id.* at 160–61. Thus, this factor is neutral.

### c. Actual confusion

The sixth factor, evidence of actual confusion, weighs in favor of NFP. To determine whether there is evidence of actual confusion, the Court must assess whether "reasonable and prudent consumers" would identify the infringing logo as coming from a company affiliated with NFP. *Platinum Home Mortg. Corp. v. Platinum Fin. Grp., Inc.*, 149 F.3d 722, 729 (7th Cir. 1998). NFP offers four examples of actual confusion and the results of a consumer confusion survey administered by Dr. Rappeport. Paycom challenges each of the four instances of actual confusion and offers a report and survey administered by James Berger to rebut NFP's claims of confusion.

Two of the four purported instances of confusion are relatively weak. NFP says that Kristi Kromer-Jones, a vice president at Great Plains National Bank, "asked Jordan Cook, a benefits consultant at NFP's Oklahoma City office, whether there was a relationship between NFP and Paycom due to the similarities in the companies' logos." Pl.'s Mem. in Supp. of Mot. for Prelim. Inj., Ex. 47 at 4 (NFP's response to Paycom's Interrog. No. 1). Apart from this assertion in an interrogatory response, NFP has not provided any information about Kristi Kromer-Jones. It is unclear whether she is a client of NFP's. NFP's claim that an individual at Senior Star Management Company asked about the relationship between NFP and Paycom likewise is not entitled to significant weight. NFP has not identified who made that statement or provided any other information about the communication. *Id.* ("In approximately February 2015, a

representative of Senior Star Management Company, a client of NFP-MHA, asked Thad Ledford, a Vice President-Sales for NFP-MHA, about the relationship between NFP and Paycom.").

NFP's other instances of actual confusion are, however, entitled to significant weight. First, NFP offers an e-mail sent by Brett Shumate, a district manager at Automatic Data Processing (ADP), asking Cooper Johnson, vice president of sales at NFP's Oklahoma City office (NFP-MHA), if there had been "an acquisition between [NFP and Paycom] that we were not aware of, as I have noticed that your logos are now identical." Pl.'s Hr'g Ex. 14. ADP and NFP-MHA "refer business back and forth between our clients." Shumate Dep. at 15. ADP and Paycom are competitors, so Shumate was concerned that he would be shut out of NFP if it was associated with Paycom. Although Shumate is not an NFP customer because he is not a human resources executive, ADP gives NFP ten percent of any business that NFP refers to ADP, and ADP refers its clients to NFP for its benefits products. *Id.* at 15, 18, 20. A perceived affiliation with Paycom could negatively affect NFP's business if it caused ADP to stop referring business to NFP and paying NFP referral fees. Thus, even though Shumate is not an NFP client, the conversation is probative of confusion because of the relationship between ADP and NFP. The fact that Kelly Hudelson, who runs NFP-MHA, asked Shumate to send the e-mail after the two men had a conversation about the logos' similarity does not provide a basis to discredit or discount Shumate's statement. *Id.* at 36.

NFP also offers an e-mail sent to Hudelson by Rulissa Trout, vice president at Asset Plus Corp., who stated that she had received a postcard from Paycom and

noticed "that the logo is exactly like NFP's." Pl.'s Hr'g Ex. 14. She wrote, "[i]f you are connected with the Paycom team, have them take me off of their mailing list since they have my name spelled wrong anyway." *Id.* Trout is a client and former employee of NFP's Oklahoma City Office. If Trout received a postcard from Paycom, that means Paycom was targeting her as a potential client. Pl.'s Hr'g Ex. 45 (Newman-Wells declaration) ¶¶ 30–31 (stating that "Paycom mailed 81,912 pieces to potential Paycom customers" on March 17, 2014 and has mailed a similar number each month since then). In fact, the mailer Paycom offered as an exhibit is nearly identical to the mailer Trout received. *Compare* Def.'s Opp'n to Pl.'s Mot. for Prelim. Inj., Ex. 17, *with* Pl.'s Hr'g Ex. 14. Because Trout was a potential client of both companies, her e-mail supports NFP's claim of confusion.

Turning to the confusion studies, Paycom's expert, James Berger, conducted a *Squirt* survey with an array. *See* 6 McCarthy on Trademarks and Unfair Competition § 32:173.50 (describing *Squirt* surveys). The respondents in Berger's Internet survey were people whose jobs involved payroll, insurance, and personnel, although Berger did not limit the sample to employees with the authority to make human resources or payroll decisions. In the survey, respondents were presented six logos, including Paycom and NFP's logos. Pl.'s Hr'g Ex. 22 at 46–47 (Berger's original rebuttal report). All of the logos had interlocking bars, and three of the logos were green (including Paycom and NFP's). In addition to other questions, Berger asked each respondent if he or she thought any of the logos belonged to (1) the same company, (2) associated companies, (3) affiliated companies, or (4) sponsored companies. *Id.* at 17. He found that 4.6% of respondents thought Paycom and NFP's logos belonged to the same company, 6.6%

thought they were associated, 5.6% thought they were affiliated, and 2% thought they were sponsored. Pl.'s Hr'g Ex. 40 at 5 (Berger's updated results). Berger did not indicate how many unique respondents answered at least one of the four questions in the affirmative. That is the relevant inquiry, as the Court must consider "whether the customer would believe that the trademark owner sponsored, endorsed *or* was otherwise affiliated with the product." *AutoZone, Inc.*, 543 F.3d at 930 (internal quotation marks omitted) (emphasis added). When asked about this at the evidentiary hearing, Berger admitted that his report did not include that tabulation. 5/15/2015 Tr. 437. It is conceivable that the proportion of respondents who perceived some affiliation was as high as eighteen percent, if one assumes that different respondents saw a connection between NFP and Paycom for each question. At the very least, Berger's framing of the data likely understates the total percentage of source confusion, as presumably at least some respondents perceived a connection in response to certain questions but not others. Because the Court cannot ascertain how many participants perceived a relationship between NFP and Paycom based on their logos, Berger's survey is of little utility as evidence rebutting NFP's claim of actual confusion.

This is the first of a number of problems with Berger's survey. It was clear from his testimony that Berger was not personally involved in the administration of the survey or the analysis of its results. Though that is not a basis to disqualify him from testifying, Berger was unable to answer basic questions about the study. *See, e.g.*, *id.* at 391 ("Q. And were—do you recall the very—in general, what the colors of the logos were [in the array]? A. Well, there was a little green, I think there was some yellow, some red. I don't remember exactly. You probably have it in the evidence."). Additionally, Berger's

17

sample was not limited to people with the authority to make decisions about human resources. The relevant customers are purchasers of human resources services. Berger's study is appropriately given less weight because he did not limit his universe of respondents to potential customers. *See Piper Aircraft Corp. v. Wag-Aero, Inc.*, 741 F.2d 925, 930 (7th Cir. 1984).

Additionally, the independent validation of Berger's study casts doubt on his methodology. Of thirty-one survey participants contacted by an independent firm, ten were not actually qualified to take the survey. Pl.'s Hr'g Ex. 22 at 106. This calls into question how many of the other 201 participants were qualified.

Berger's methodology was also called into question by the fact that he issued a supplemental report after opposing counsel identified a problem with his methodology during his deposition. Specifically, "opposing counsel pointed out that if somebody [ ] just put down one letter or indicat[ed] one logo" when asked if they believed any of the six logos belonged to the same company, "they probably shouldn't be counted in the survey." 5/15/2015 Tr. 395; *see also* Pl.'s Hr'g Ex. 40 (Berger's supplemental rebuttal report). Although Berger updated his report to remedy this problem, this error demonstrates a lack of supervision and care.

Moreover, it was clear that no one from Berger's firm had read the verbatim responses to the survey questions. 5/15/2015 Tr. 422 (Berger testimony; "You know, I don't think I ever really looked in great depth at the verbatim responses."). Respondents listed answers such as "LOL" and "cool" to substantive questions like: "For each logo you are familiar with, please indicate the company or organization that is associated with it" and "Why do you say that?" (related to the question, "Do you know

18

which one of these logos belongs to Paycom Payroll, LLC?").  Pl.'s Hr'g Ex. 22 at 71,

91, 93.  Berger should have removed nonresponsive answers from the survey data.

Finally, Paycom and NFP's logos were not depicted in the same size in Berger's

array.  NFP's logo was significantly larger than Paycom's logo, which might have made

them appear less similar to respondents.  5/15/2015 Tr. 414 (Berger testimony; "Q.  It

looks like the Paycom logo is about a fourth, a fifth smaller in width than the NFP logo,

correct?  A.  It looks that way, yes.").  Given these problems with Berger's study, the

Court concludes that his survey was not reliable.

NFP's expert, Dr. Michael Rappeport, came up with a thirty-nine percent rate of

source confusion when he conducted a two-room survey with a control cell.  5/7/2015

Tr. 128.  All of the respondents were "people involved in making decisions about

employee benefits and/or payroll administration as part of their work."  Pl.'s Hr'g Ex. 18

at 3.  Interviewers contacted each respondent by telephone and instructed the

respondent to view a website.  *Id*.  Respondents viewed and answered questions about

logos depicted on two separate screens (historically, the marks were presented in two

rooms, hence the term used for this type of survey).  On the first screen, respondents

were shown NFP's logo.  As a respondent viewed the first screen, the interviewer asked

whether she had seen the logo and whether she knew the name of the company that

uses the logo.  *Id*. at 6.  Each respondent was then directed to the second screen,

where she viewed an array of five logos—half of the respondents viewed an array that

contained Paycom's mark and half viewed a control cell that did not contain the mark

(instead, it contained a flattened version of Paycom's mark depicted in two shades of

blue with the orientation changed). Otherwise the logos in the control cell were identical to those in the experimental cell. The interviewer asked if the respondent thought

> 1. one or more of these logos is used by a company that is connected or affiliated with the company that uses the first logo I showed you, or
> 2. none of these logos are used by a company that is connected or affiliated with the company that uses the first logo I showed you, or
> 3. don't you have an opinion.

*Id.*, App. B at 3. The question and possible responses were also shown on the respondent's computer screen. *Id.*, App. C at 4.

In Rappeport's study, forty-five percent of respondents thought that the company that used Paycom's logo was "connected or affiliated" with the company that used NFP's logo. *Id.* at 9. Of the respondents who viewed the control room, six percent thought the altered blue Paycom logo's company was affiliated with NFP. That six percent, according to Rappeport, constituted the noise estimate, or the proportion of respondents who were simply guessing. Rappeport assumed the noise estimate was the same in the test cell and the control cell and subtracted that number from the forty-five percent confusion rate. Based on this calculation, Rappeport concluded that thirty-nine percent of respondents thought NFP and Paycom were affiliated. 5/7/2015 Tr. 147.

Berger criticized Rappeport's study. First, he argued that the two-room methodology biased respondents by instructing them to pick the most similar logo to the logo displayed on the first screen. Rappeport responded that the two-room study more accurately reflects marketplace conditions. NFP and Paycom offer services, rather than products that are viewed on a store shelf, so it is unlikely that consumers see the two logos side-by-side in the marketplace. Instead, they see them one at a time, as they

20

were presented in the two-room survey. The Court finds this response persuasive. *See Ty, Inc.*, 237 F.3d at 898 (7th Cir. 2001) ("When attempting to determine if two marks are similar, the comparison should be made in light of what happens in the marketplace, [and] not merely by looking at the two marks side-by-side." (internal quotation marks omitted)). Two-room studies have been cited with approval as "an attempt to replicate the marketplace process of advertising exposure to a brand or trade dress, followed by being confronted in the market with both similar and differing brands or trade dresses." 6 McCarthy, *supra*, § 32:177. Additionally, the results from the control cell suggest that any bias was minimal in Rappeport's survey. In the experimental cell, forty-five percent of respondents thought Paycom and NFP were related, four percent thought NFP was related to one of the other companies in the array, and fifty-three percent thought none of the logos were affiliated or did not have an opinion. In the control cell, however, only six percent thought the NFP logo was affiliated with the modified Paycom logo, thirteen percent thought NFP was affiliated with one of the other companies, and eighty percent thought none were affiliated or did not have an opinion. Pl.'s Hr'g Ex. 18 at 9. A significant proportion of respondents in the control cell, eighty percent, did not choose any logo when they did not perceive any affiliation or did not have an opinion, compared to fifty-three percent who did not choose an affiliated logo in the experimental cell. This data suggests that respondents were not all biased toward picking the closest match. The control cell in Rappeport's study helped to isolate any effect from potential bias.

Berger also thought that the other logos in Rappeport's array were too dissimilar to NFP's logo and that this led more respondents to pick Paycom's logo. Rappeport responded that the other logos in the array were a "weaker form of control" compared to

the true control (the modified Paycom logo in the control cell).  He agreed that alone the weak controls "could just be too far away" from the NFP mark to allow for meaningful testing.  5/7/2015 Tr. 143.  He noted that it is difficult to avoid highlighting the infringing product when portraying the infringing logo next to logos that are not as similar to the plaintiff's.  Rappeport explained, however, that using a control cell helps to account for this problem.  *Id.* at 167.  In other words, the control cell, rather than the other logos in the array, is the main comparator.  The Court concludes that the fact that the other logos in the array were dissimilar to NFP's does not render Rappeport's survey problematic.

Berger also suggested that Rappeport's sample, which included 100 respondents in the experimental cell and 80 in the control cell, was too small.  Although the study would have been more convincing with more respondents, resource limitations likely played a role.  Michael Rappeport, *Litigation Surveys—Social "Science" As Evidence*, 92 Trademark Rep. 957, 960 (2002) ("There are never infinite resources, so in trying to create the best possible survey one is always limited by the available time and money.").  The relatively small sample size may affect the weight the Court gives the survey but does not render the survey unreliable.

Berger also argued that it was inappropriate for Rappeport to include "don't you have an opinion" as one of the options when respondents were asked if any of the logos in the array were affiliated with NFP.  Pl.'s Hr'g Ex. 18, App. B at 3.  The "don't you have an opinion" wording was rather clunky, but that does not mean that respondents were confused by it.  When a respondent considered the "don't you have an opinion" option after the other two choices—the first of which applied if a respondent thought the logos

22

were from connected or affiliated companies and the second applied if she did not think the companies were connected or affiliated—it would have been obvious that "don't you have an opinion" meant "I don't have an opinion."  Moreover, the wording does not appear to have affected the results, perhaps because a confused respondent could simply ask the interviewer what that option meant.  Sixty percent of respondents in the control cell selected the "don't you know" option, as opposed to thirteen percent in the experimental cell.  This suggests that the "don't you know" wording did not deter respondents from selecting that option.

No study is perfect, of course.  *See* 6 McCarthy, *supra*, § 32:178 ("One must keep in mind that there is no such thing as a 'perfect' survey.  The nature of the beast is that it is a sample, albeit a scientifically constructed one.").  Additionally, the Court recognizes the inherent limitations of consumer confusion surveys conducted by hired experts.  *See Kraft Foods Grp. Brands LLC v. Cracker Barrel Old Country Store, Inc.*, 735 F.3d 735, 741–42 (7th Cir. 2013).  Nonetheless, Rappeport presented a well-designed and well-supported study and thoughtfully discussed its results and justified his methodology.  Accordingly, the Court finds Dr. Rappeport's thirty-nine percent rate of confusion to be probative evidence of actual confusion.  *See H-D Mich., Inc. v. Top Quality Serv., Inc.*, 496 F.3d 755, 758 (7th Cir. 2007) (evidence that twenty-seven percent of consumers thought there was an association between companies was sufficient to survive defendant's motion for summary judgment); *James Burrough Ltd. v. Sign of Beefeater, Inc.*, 572 F.2d 574, 576, 578 n.4 (7th Cir. 1978) (survey showing fifteen percent of consumers were confused as to sponsorship was sufficient to show likelihood of confusion); *Helene Curtis Indus., Inc. v. Church & Dwight Co.*, 560 F.2d

1325, 1331 (7th Cir. 1977) (affirming preliminary injunction where 290 out of 998 respondents were confused as to the source of the mark); *but see Simon Prop. Grp., L.P. v. mySIMON, Inc.*, 282 F.3d 986, 989 (7th Cir. 2002) (no likelihood of confusion when surveys "showed a 'completely negligible' likelihood of confusion, with under two percent of respondents indicating relevant confusion").

### d.    Intent

The seventh factor, intent of the alleged infringer, weighs in favor of Paycom. Amy Newman-Wells, the Paycom executive who conceptualized the infringing mark, testified that she did not know about NFP's interlink logo when she created the mark. 5/15/2015 Tr. 345.  NFP offered no evidence suggesting that Newman-Wells intentionally copied the NFP mark.  The Court finds Newman-Wells' testimony credible on this point.

In sum, four of the factors favor NFP, one favors Paycom, and two favor neither party.  Given the overlap between the two parties' customers, the strong similarity between the marks, and the evidence of actual confusion, the Court concludes that NFP is highly likely to succeed on the merits of its infringement claim.

### 3.    Abandonment

The Court concludes that Paycom has not shown that NFP abandoned its trademark rights by engaging in naked licensing of its logo.  A defendant can assert a defense of abandonment through "uncontrolled or 'naked' licensing" by showing that a trademark owner failed to maintain "reasonable control" over product quality and "allow[ed] licensees to depart from its quality standards."  *TMT N. Am., Inc. v. Magic Touch GmbH*, 124 F.3d 876, 885 (7th Cir. 1997).  If that happens, "the public will be

misled, and the trademark will cease to have utility as an informational device.'" *Id.*
(quoting *Ky. Fried Chicken Corp. v. Diversified Packaging Corp.*, 549 F.2d 368, 387 (5th
Cir. 1977)); *see also Eva's Bridal Ltd. v. Halanick Enters., Inc.*, 639 F.3d 788, 789–90
(7th Cir. 2011) (finding abandonment by naked licensing when the mark owner "never
tried to control any aspect of how defendants' shop operated or how the mark was
used"). The Seventh Circuit applies "a flexible approach but allows licensors to rely at
least somewhat on the reputation and expertise of licensees." *TMT N. Am., Inc.*, 124
F.3d at 885. Paycom bears a "heavy burden . . . [of] asserting a lack of reasonable
control by a licensor." *Id.* (quoting Restatement (Third) of Unfair Competition § 33 cmt.
c (1995)).

NFP allows roughly 300 members of its two membership organizations, Benefits
Partners and Partners Financial, to use the NFP interlink logo but not the NFP name.
Those companies are not owned by NFP. Paycom suggests that NFP has not
exercised reasonable control over these licensees, because NFP does not supervise
their use of the interlink and has not produced an agreement governing trademark
usage signed by any of those organizations.

NFP produced detailed style guides specifically created for Benefits Partners and
Partners Financial that govern how their members may use the interlink logo. Pl.'s Hr'g
Ex. 6. NFP also offered Benefits Partners and Partners Financial membership
agreements, which require member companies to use the marks "in accordance with
standards published from time to time . . . ." Pl.'s Hr'g Ex. 7. Although NFP did not
produce a signed membership agreement, Boester testified credibly that all member
organizations have signed the agreements. 5/7/2015 Tr. 47. He also testified that

25

some members' marketing materials are reviewed by NFP, although he admitted that NFP does not monitor all of their marketing materials. *Id.* at 89.

"Absent a significant deviation from the licensor's quality standards, a licensor does not forfeit its trademark rights through licensing agreements." *TMT N. Am., Inc.*, 124 F.3d at 886. There is no evidence tending to show that Benefits Partners or Partners Financial's members have significantly deviated from NFP's quality standards. Although Paycom pointed out one instance of inappropriate use of the NFP interlink by a Benefits Partners member company, this does not mean that NFP has ceded control of its logo. Pl.'s Hr'g Ex. 41 at 6 (e-mail signature of a Benefits Partners member employee depicting the NFP mark after the word "A" in "A Benefits Partners member"). Moreover, NFP has offered evidence that it exercises some degree of control over licensees' use of the mark. Accordingly, Paycom has not met its burden of showing abandonment.

**B.      Irreparable harm and adequacy of legal remedies**

The Seventh Circuit has articulated a presumption of irreparable harm in trademark infringement cases. *See Ty, Inc.*, 237 F.3d at 902; *Int'l Kennel Club*, 846 F.2d at 1092; *Processed Plastic Co. v. Warner Commc'ns, Inc.*, 675 F.2d 852, 858 (7th Cir. 1982). The Supreme Court, however, has called this presumption into question. In *eBay Inc. v. MercExchange, LLC*, 547 U.S. 388 (2006), the Supreme Court rejected the categorical rule that a permanent injunction must issue upon a showing of patent infringement. *Id.* at 392–94. The Court observed that in copyright cases it "has consistently rejected invitations to replace traditional equitable considerations with a rule that an injunction automatically follows a determination that a copyright has been

infringed." *Id.* at 393–94. Applying these principles to a Patent Act case, the Court instructed that the district court should have applied "the traditional four-factor framework that governs the award of injunctive relief." *Id.* at 394.

Although the Seventh Circuit has not addressed whether *eBay* applies to preliminary injunctions in Lanham Act cases, the court has held that "*eBay* governs a motion for a preliminary injunction in a copyright case." *Flava Works, Inc. v. Gunter*, 689 F.3d 754, 755 (7th Cir. 2012). The Court sees no reason why the Seventh Circuit would reach a different conclusion in a Lanham Act case. The decisions of other appellate courts indicate a trend toward requiring irreparable harm before issuing an injunction in trademark infringement cases. The Third Circuit has held that "there is no presumption of irreparable harm afforded to parties seeking injunctive relief in Lanham Act cases." *Ferring Pharm., Inc. v. Watson Pharm., Inc.*, 765 F.3d 205, 216 (3d Cir. 2014). The court noted that the Supreme Court's language in *eBay* was not limited to patent cases. *Id.* at 215–16. As the Third Circuit pointed out, the Court in *eBay* suggested that a departure from equity principles is permissible only when there is clear congressional intent. *eBay Inc.*, 547 U.S. at 391–92; *see also Ferring Pharm., Inc.*, 765 F.3d at 215. The Third Circuit observed that the Lanham Act, like the Patent Act, was drafted to incorporate '"traditional principles of equity,'" and thus concluded that the same standards should apply. *Ferring Pharm., Inc.*, 765 F.3d at 214–15 (quoting *eBay*, 547 U.S. at 393–94). The Ninth Circuit has also held that likelihood of irreparable harm must be demonstrated before a preliminary injunction may issue in a trademark infringement action. *See Herb Reed Enters., LLC v. Fla. Entm't Mgmt., Inc.*, 736 F.3d 1239, 1249 (9th Cir. 2013), *cert. denied*, 135 S. Ct. 57 (2014). Other appellate courts

have suggested in dicta that they would reach the same conclusion. *See, e.g.*, *Swarovski Aktiengesellschaft v. Bldg. No. 19, Inc.*, 704 F.3d 44, 54 (1st Cir. 2013) (noting that "there is no principled reason why [*eBay*] should not apply to a request for a preliminary injunction to halt trademark infringement" but declining to decide the question); *N. Am. Med. Corp. v. Axiom Worldwide, Inc.*, 522 F.3d 1211, 1228 (11th Cir. 2008) ("Although *eBay* dealt with the Patent Act and with permanent injunctive relief, a strong case can be made that *eBay*'s holding necessarily extends to the grant of preliminary injunctions under the Lanham Act."); *Audi AG v. D'Amato*, 469 F.3d 534, 550 (6th Cir. 2006) (applying *eBay* to a permanent injunction in a trademark infringement case without extensive analysis). The Court finds the Ninth and Third Circuits' reasoning persuasive and concludes that NFP must show a likelihood of irreparable harm to be entitled to a preliminary injunction. *See Winter v. Nat. Res. Def. Council, Inc.*, 555 U.S. 7, 22 (2008) (stating that plaintiffs requesting a preliminary injunction must "demonstrate that irreparable injury is *likely* in the absence of an injunction").

NFP has sufficiently shown that it will suffer irreparable harm in the absence of an injunction. The Lanham Act is designed to redress "the precise economic consequences of intangible harms, such as damage to reputation and loss of goodwill." *Abbott Labs. v. Mead Johnson & Co.*, 971 F.2d 6, 16 (7th Cir. 1992). "The most corrosive and irreparable harm attributable to trademark infringement is the inability of the victim to control the nature and quality of the defendant's goods." *Processed Plastic Co.*, 675 F.2d at 858. To show irreparable harm, NFP need not show that it lost

business as a result of Paycom's alleged infringement. *See Int'l Kennel Club*, 846 F.2d at 1091.

NFP contends that it will suffer harm from "continued consumer confusion regarding whether or not these companies are related." 5/15/2015 Tr. 503. It also states that "NFP has no way of identifying those other consumers who have been confused by Paycom's use of the Infringing Paycom Logo." Pl.'s Mem. in Supp. of Mot. for Prelim. Inj. at 23. NFP has offered evidence that it spent over $11 million from 2010 through 2014 on advertising, marketing, and promotion using its interlink logo. Pl.'s Hr'g Ex. 11. This evidence is probative of harm. If a company spends significant time and resources promoting its trademark, that is a strong indication that the mark has significant economic value as a source identifier. Any infringement that impedes that identifying function will cause significant harm. The use of the interlink brand was particularly important to NFP, because the new logo was designed and promoted as part of a mass marketing effort to emphasize that NFP and its owned and member companies were all part of "one NFP." Pl.'s Hr'g Ex. 4. Boester testified that the purpose of the rebranding effort was to "pull[] together all of the operating subsidiaries that used to operate in a relatively independent fashion under a common look and feel of the NFP logo." 5/7/2015 Tr. 30. The NFP logo with interlocking diamonds was designed to represent closer partnerships between NFP and its subsidiaries. *Id.* at 31; Pl.'s Hr'g Ex. 4.

The fact that the marks are similar and the target audiences are identical also supports NFP's contention that it will be irreparably harmed. *See Ideal Indus., Inc. v. Gardner Bender, Inc.*, 612 F.2d 1018, 1025 (7th Cir. 1979) ("The existence of

irreparable injury is positively supported by the fact that the alleged trademark and the infringing use are identical, that the products are the same, and that the markets are the same. These factors by themselves are indicative of irreparable injury."). Additionally, the compelling evidence of consumer confusion supports a finding of irreparable harm. "Where there is [ ] such high probability of confusion, injury irreparable in the sense that it may not be fully compensable in damages almost inevitably follows," because the defendant's profits on the infringing items are "often difficult to determine" and "confusion may cause purchasers to refrain from buying either product and to turn to those of other competitors." *Helene Curtis Indus., Inc.*, 560 F.2d at 1332–33 (quoting *Omega Importing Corp. v. Petri-Kine Camera Co.*, 451 F.2d 1190, 1195 (2d Cir. 1971)). In this case, NFP has presented compelling evidence of consumer confusion. Because the damage to NFP's good will and reputation caused by this confusion is inherently intangible and impossible to quantify, the harm is irreparable. Although NFP's evidence of irreparable harm is not overwhelming, it has presented sufficient evidence to show that it will suffer such harm without an injunction.

Paycom argues that NFP's delay in seeking a preliminary injunction undercuts its claim of irreparable harm. NFP became aware of Paycom's logo on June 16, 2014. It discovered in July or August of 2014 that Paycom was one of the biggest clients of a company that NFP was acquiring. NFP executives thought a lawsuit might put the transaction at risk, so NFP decided to wait until after the deal was finalized to approach Paycom about its logo. 5/7/2015 Tr. 69–70. Evidence was presented that $40,000 of the target company's yearly revenues was attributable to its business with Paycom. Pl.'s Hr'g Ex. 15. Paycom argues that if NFP was willing to delay suit to save $40,000

of yearly revenues, this suggests that its harm was not truly irreparable. The evidence indicated, however, that NFP was not simply concerned with the $40,000 of yearly revenues attributable to Paycom, but was worried that litigation with Paycom could put the entire transaction at risk. 5/7/2015 Tr. 69 (Boester testimony).

In any event, the delay does not preclude a finding of irreparable harm. Boester testified that NFP did not sue Paycom right away in part because "we felt that we could work out a solution" without suing. *Id.* at 66. He said that the original plan was for the target company's CEO to reach out to Paycom, but that plan fell through. Although the precise dates are unclear, Boester testified that NFP realized that this informal approach would not work "within weeks" after August 15. *Id.* at 71. NFP contacted Paycom on September 23, 2014, when it sent Paycom's general counsel a tolling agreement, the purpose of which was to help facilitate resolution without litigation. Pl.'s Hr'g Ex. 16 at 5. According to Boester, the companies' general counsels spoke. NFP filed suit that same day "when it appeared that we weren't going to come to a resolution." 5/7/2015 Tr. 74. NFP moved for a preliminary injunction shortly after that on October 15, 2014.

Contrary to Paycom's contention, NFP's delay in filing suit does not support its contention that NFP's injuries are quantifiable. Based on the evidence presented to the Court, NFP always intended to approach Paycom about its logo. Thus, it is not correct to suggest that the logo can be valued at an amount less than $40,000 per year. Although NFP was willing to suffer some amount of harm to its good will and reputation during its three-month delay before filing this lawsuit, the decision to delay suit was not

unreasonable under the circumstances and does not conflict with the Court's conclusion that NFP's harm is irreparable.

Moreover, "[w]hether the defendant has been lulled into a false sense of security or had acted in reliance on the plaintiff's delay influences whether we will find that a plaintiff's decision to delay in moving for a preliminary injunction is acceptable or not." *Ty, Inc.*, 237 F.3d at 903 (internal quotation marks omitted). Paycom has not offered any evidence that it acted in reliance on NFP's delay or was lulled into believing that Paycom would refrain from suing. Thus, the delay cited by Paycom does not weigh against a finding of irreparable harm. *See id.* (stating that a "[d]elay in pursuing a preliminary injunction may raise questions regarding the plaintiff's claim that he or she will face irreparable harm," but finding that the defendant "has not presented any affirmative evidence that Ty's delay in seeking a preliminary injunction caused Jones to be lulled into a false sense of security or that Jones in any way relied on Ty's delay"); *Ideal Indus., Inc.*, 612 F.2d at 1025 ("[D]elay is only one among several factors to be considered; these cases do not support a general rule that irreparable injury cannot exist if the plaintiff delays in filing its motion for a preliminary injunction.").

### C.    Balancing the hardships and the public interest

To determine whether to issue an injunction, the Court must balance the harm NFP will suffer in the absence of an injunction with the harm that Paycom will suffer if it is enjoined from using its logo. *See Ty, Inc.*, 237 F.3d at 895. "[T]he more likely [it is that] the plaintiff will succeed on the merits, the less the balance of irreparable harms need favor the plaintiff's position." *Id.* Here, as the Court has concluded, it is highly

likely that NFP will succeed on the merits, so NFP has a lower threshold of relative hardship to surmount.

Paycom significantly overstates the hardship it would suffer if the Court issues an injunction. Newman-Wells estimated that it would cost $3 million to change Paycom's logo. Pl.'s Hr'g Ex. 45 ¶ 56. Paycom claims that it spent $450,000 in "out-of-pocket cost[s]" promoting its logo from February 2014 to the present. Def.'s Opp'n to Pl.'s Mot. for Prelim. Inj. at 5. The Court acknowledges that designing a new logo and updating promotional materials and signage will be costly, but the Court does not accept Paycom's claimed expenses. Newman-Wells claims that Paycom stores $235,000 of inventory, such as promotional tee-shirts, keychains, and coffee mugs, at a warehouse at any given time. Pl.'s Hr'g Ex. 45 ¶ 40. If the warehouse only contained tee-shirts at a cost of $10 per tee-shirt, that would mean 23,500 tee-shirts were stored there, a rather ridiculously high number. The figure makes no more sense if it is divided among tee-shirts, keychains, and mugs, all of which are low-cost items. The Court cannot and does not accept the otherwise unsupported contention that a company that sells technology products and services, not clothing or other objects, maintains this size of an inventory of logo merchandise. Newman-Wells also claims that Paycom created multiple trade show booths that depict its new logo at a cost of $80,000 per booth. Based on the image provided to the Court, Paycom's logo is only depicted in a few places on the booth. *Id.* ¶ 41. Based on the evidence before the Court, it appears highly unlikely that the trade show booths would have to be completely replaced were the Court to enter an injunction. Newman-Wells' calculation also includes roughly $4,000 per month for billboard advertisements, but this figure seems to be the cost to

rent billboard space, not the cost of replacing the images displayed on the billboards. *Id.* ¶¶ 45–46.

Newman-Wells also claims that between March and December 2014, Paycom paid $2.7 million to the company that does its promotional materials. 5/15/2015 Tr. 373. It is likely that a good deal of that cost was for printing and mailing and other activities unrelated to design work. If so, it would be relatively easy to swap out the old logo and continue to print and mail materials. In short, though Paycom will have to alter its marketing materials if it is enjoined from using its logo, it has not isolated the cost of changing designs. Instead, Paycom has presented its general marketing expenses, much of which will remain constant whether or not it is forced to change its logo.

In its response brief, Paycom states that in addition to its out-of-pocket costs, its employees have worked "thousands of man-hours" to roll out the logo. Def.'s Opp'n to Pl.'s Mot. for Prelim. Inj. at 5. Paycom has not offered any evidence that the design costs and opportunity costs would total $2.5 million ($3 million less its out-of-pocket costs of $450,000). Although it would no doubt impose a significant expense upon Paycom were it required to develop a new logo and change the logo on its business cards, website, payroll machines, building installations, and trade show booths, the evidence reflects that the cost would be significantly less than the $3 million that Paycom claims.

Additionally, "[o]ne entering a field already occupied by another has a duty to select a trademark that will avoid confusion." *Ty, Inc.*, 237 F.3d at 903 (internal quotation marks omitted). Although Paycom was unaware of NFP's mark when it begin using its logo on February 28, 2014, its executives and attorney discovered the NFP

mark as early as March 24, 2014. Pl.'s Hr'g Ex. 33. Despite this discovery, Paycom's attorney did not stop the use of the mark and did not notify the company's chief financial officer of NFP's mark before he submitted a declaration to the U.S. Patent and Trademark Office on June 12, 2014, in which he stated that he believed "no other person has the right to use the mark in connection with the goods/services of such other person." Pl.'s Hr'g Ex. 31 at 14. The lawyer who learned of NFP's mark was the same lawyer who helped prepare the trademark application. 5/15/2015 Tr. 314. This evidence suggests that Paycom's legal team took a calculated risk by deciding to adopt and promote the company's new mark despite the similarity in appearance between the two logos.

When a defendant intentionally copies a mark, courts discount the defendant's expenditures in promoting the mark. *See Ty, Inc.* 237 F.3d at 903. ("Jones went ahead with its production of the Beanie Racers . . . knowing full well it may face legal challenges to its product and in turn negative financial consequences."). Although Paycom was initially unaware of NFP's mark, Paycom realized the marks were similar less than one month after it created its mark. Paycom voluntarily assumed the risk that it might be held liable for infringement when it spent significant resources to promote its new logo after that time.

In sum, the balance of the hardships does not tilt the scale against entry of a preliminary injunction. NFP has presented some evidence that it will suffer harm if Paycom continues to use the infringing logo, though this evidence is far from overwhelming. Although Paycom will suffer if it has to stop using its mark, it has presented unconvincing evidence about the exact cost of such a change and the Court

discounts the claimed costs because of Paycom's early knowledge of NFP's logo.

Under the sliding scale approach, "the stronger the case on the merits, the less

irreparable harm must be shown" by the plaintiff. *Ty, Inc. v. GMA Accessories, Inc.*, 132

F.3d 1167, 1172 (7th Cir. 1997). Because NFP's trademark infringement claim is very

strong on the merits, the risk of error if an injunction is entered is low. *See id.* (stating,

in a copyright infringement case, that "[i]f the likelihood of a substantive mistake—relief

granted without an actual infringement of the plaintiff's rights—is slight, the fact that the

plaintiff may not have a compelling need for interim relief is not a great worry"); *Girl*

*Scouts of Manitou Council, Inc. v. Girl Scouts of U.S.A., Inc.*, 549 F.3d 1079, 1086 (7th

Cir. 2008) (noting that the balancing of the hardships is "an attempt to minimize the cost

of potential error").

Additionally, the Court finds that the public's interest in avoiding confusion about

the companies' affiliation is relatively strong, particularly because these are logos whose

sole purpose is to operate as source identifiers. Accordingly, the Court concludes that

NFP is entitled to a preliminary injunction.

**D.    Bond**

Under Federal Rule of Civil Procedure 65(c), "the court may issue a preliminary

injunction or a temporary restraining order only if the movant gives security in an

amount that the court considers proper to pay the costs and damages sustained by any

party found to have been wrongfully enjoined or restrained." Fed. R. Civ. P. 65(c). The

Seventh Circuit has stated that "absent extraordinary circumstances, the court errs in

not granting" a defendant's request for a bond. *Reinders Bros. v. Rain Bird E. Sales*

*Corp.*, 627 F.2d 44, 54 (7th Cir. 1980). "The purpose of an injunction bond is to

compensate the defendant, in the event he prevails on the merits, for the harm that an injunction entered before the final decision caused him." *Ty, Inc. v. Publ'ns Int'l Ltd.*, 292 F.3d 512, 516 (7th Cir. 2002). A bond is appropriate in this case, as Paycom argues, because it will be forced to incur costs in rebranding. *See* Def.'s Opp'n to Pl.'s Mot. for Prelim. Inj. at 30 ("If NFP ultimately cannot prove trademark infringement, then Paycom would be entitled to recover the costs of re-branding.").

"When setting the amount of security, district courts should err on the high side." *Mead Johnson & Co. v. Abbott Labs.*, 201 F.3d 883, 888 (7th Cir.), *op. am. on denial of reh'g*, 209 F.3d 1032 (7th Cir. 2000). Because "[a] party injured by an erroneous preliminary injunction is entitled to be made whole," the bond must be high enough to cover any losses the defendant incurs in the event the preliminary injunction was erroneously entered. *See Roche Diagnostics Corp. v. Med. Automation Sys., Inc.*, 646 F.3d 424, 428 (7th Cir. 2011) ("Judges [ ] should take care that the bond is set high enough to cover the losses that their handiwork could cause."). "[B]ecause the damages for an erroneous preliminary injunction cannot exceed the amount of the bond," it is particularly important for the Court to consider Paycom's "full costs" when setting bond. *Mead Johnson & Co.*, 201 F.3d at 888; *see also Roche Diagnostics Corp.*, 646 F.3d at 428 ("Established doctrine has it that the damages payable to a person injured by an erroneously issued injunction cannot exceed the amount of the bond.").

The Court finds that only some of Paycom's rebranding costs are supported by the evidence. Those include the cost of changing employees' business cards ($33,500), the signage at corporate headquarters ($23,000), the installation of one

billboard ($2,700), and a new tarp at the University of Central Oklahoma's stadium ($12,300), for a total of $71,500. Pl.'s Hr'g Ex. 45 ¶¶ 32, 37, 43, 45. Paycom cites other out-of-pocket costs, along with the "thousands of man-hours" associated with designing a new logo and updating its promotional materials. Def.'s Opp'n to Pl.'s Mot. for Prelim. Inj. at 5. As the Court has discussed, none of these additional costs are supported by evidence in the record. Paycom offers no evidence to support its claim that "countless man-hours" were spent implementing the new logo, and it has not quantified its graphic design costs. Nonetheless, the Court recognizes that there will be expenses associated with the design and implementation of a new logo (although Paycom will not be entitled to design costs if it simply goes back to using its old logo, which would be the simplest course). Additionally, Paycom will have to update its inventory (although not to the tune of $235,000), mailers and other promotional materials, brand guidelines, YouTube videos, and the signage at its regional offices. Even though Paycom has not offered evidence that supports these costs, the Court nonetheless recognizes that these expenses may be significant. The Court therefore triples the $71,500 that is supported in the record to account for these rebranding costs and orders NFP to post a bond in the amount of $214,500. Although this is necessarily an imprecise estimate, Paycom was put on notice that the cost of rebranding would be litigated when NFP raised the issue in its brief and thus had ample opportunity to offer evidence about rebranding costs.

## Conclusion

For the foregoing reasons, the Court grants NFP's motion for a preliminary injunction and orders NFP to post a bond in the amount of $214,500 [dkt. no. 13]. The parties are directed to file a proposed preliminary injunction by no later than June 12,

2014. The case is set for a status hearing regarding the form of the proposed order on June 16, 2015 at 9:30 a.m.

_____
MATTHEW F. KENNELLY
United States District Judge

Date: June 10, 2015